[Cite as *State v. Lathon*, 2024-Ohio-5886.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| | : | Nos. 21AP-454 |
| | | (C.P.C No. 19CR-6566) |
| State of Ohio, | : | |
| | | 21AP-455 |
| Plaintiff-Appellee, | : | (C.P.C. No. 19CR-3233) |
| | | |
| v. | : | 21AP-456 |
| | | (C.P.C. No. 19CR-0009) |
| Jermaine L. Lathon, | : | |
| | | 21AP-457 |
| Defendant-Appellant. | : | (C.P.C. No. 19CR-0008) |
| | | |
| | : | (REGULAR CALENDAR) |
| State of Ohio, | : | |
| | | |
| Plaintiff-Appellee, | : | Nos. 21AP-459 |
| | | (C.P.C. No. 19CR-6559) |
| v. | : | |
| | | 21AP-478 |
| Shon D. Gardner, Jr., | : | (C.P.C. No. 18CR-6143) |
| | | |
| Defendant-Appellant. | : | (REGULAR CALENDAR) |

D E C I S I O N

Rendered on December 17, 2024

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Mark R. Willson*, for appellee. **Argued:** *Mark R. Wilson*.

**On brief:** [*Mitchell A. Williams*], Franklin County Public Defender, and *Leon J. Sinoff*, for appellant Jermaine L. Lathon. **Argued:** *Leon J. Sinoff*.

**On brief:** *April F. Campbell*, for appellant Shon D. Gardner, Jr.

APPEALS from the Franklin County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1}    Defendants-appellants, Jermaine L. Lathon and Shon D. Gardner, Jr., appeal judgments of the Franklin County Court of Common Pleas that convicted and sentenced them for multiple offenses.  For the following reasons, we affirm in part and reverse in part the judgments convicting and sentencing Lathon, and we affirm the judgments convicting and sentencing Gardner.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2}    In January 2014, Calvin Fluellen shot and killed Terrico Henry.  Fluellen, who was a juvenile at the time of the shooting, admitted to the offense of reckless homicide with a firearm specification.  The Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch adjudicated Fluellen a delinquent minor and committed him to juvenile detention.  When Fluellen was released from juvenile detention in 2015, police patrolling the Linden area of Columbus began hearing about a new gang, called "Everything King Terk" or "EKT" for short.  The gang was formed to honor Henry, whose nickname was "King Terk."

{¶ 3}    EKT is a subset of Windsor Terrace Posse, a gang that operates in the Linden area.  Detective James Kirk of the Columbus Division of Police explained the relationship between EKT and Windsor Terrace Posse:

> So structure wise, one analysis that we use is like major league baseball. They have your major league team. You have your AAA, AA teams. They all have the same affiliation to the major league team.
>
> So in this instance, you know, your major league team would be Windsor Terrace Posse. You have subsets that break off from each other. Sometimes it's just strictly based on age. You know, you have a different age group.
>
> You know, Windsor Terrace Posse has an older age group. Some of the younger kids still want to be affiliated with that, but they want to show their own subset, so they will break off from, you know, Windsor Terrace Posse and create Banger Squad [and] Everything King Terk.

(Tr. Vol. VI at 1177-78.)

{¶ 4}    Continuing with the baseball analogy, Detective Kirk explained that the Bloods and Crips are similar to the American League and National League.  Windsor Terrace Posse, and its subsets Banger Squad and EKT, are affiliated with the Crips.

{¶ 5}     According to Detective Kirk, Fluellen is the leader of EKT.  Members of EKT include Lathon, Gardner, Daevionte Draper, Taeshawn Hardy, Isaiah Webster, Maurice Cannon, and Marcus Gordon.

{¶ 6}     Although EKT was established to commemorate Henry, EKT "turned into * * * a group of people that would commit robberies and be involved in shootings, assaults, and riotous situations."  (Tr. Vol. V at 1003.)  At trial, the state of Ohio presented multiple examples of EKT members' crimes:

- On May 29, 2015, Draper got into a fight with Lavonne Watkins when Watkins disrespected a deceased gang member.  Draper shot at Watkins twice but missed and, instead, hit a house.  For this incident, Draper was adjudicated a delinquent minor for the offense of felonious assault with a firearm specification.

- On February 14, 2016, Webster shot another person in the upper leg while at a Waffle House.  For this incident, Webster was convicted of aggravated assault and having a weapon while under disability.

- On January 1, 2018, a fight occurred at the Red Club between EKT and Easthaven, a rival gang.  Fluellen was shot during the fight.

- In a Facebook Live stream later posted on YouTube, Fluellen bragged about robbing a rival gang—the Paper Chasin' Gorillas—in 2018.  Fluellen taunted the Paper Chasin' Gorillas, saying, "y'all got taken down (robbed) a year ago and I spent it on shoes."  (Pl.'s Ex. N15.)  In response to Fluellen's bragging, a member of Paper Chasin' Gorillas commented, "U took a trap house down for 100k." *Id.*  A trap house is a place where illicit drugs are stored, sold, and/or used.  As Detective Kirk explained, Paper Chasin' Gorillas accused Fluellen of robbing their trap house of $100,000.  During the livestream, the Paper Chasin' Gorillas put a bounty on Fluellen's head, which eventually reached $60,000.

- On or about July 29, 2019, four members of EKT—Lathon, Hardy, Draper, and Webster—chased down and beat Twan Stanley, a member of Easthaven, at the Ohio State Fair.  The four members of EKT encircled Stanley, punched him until he fell on the ground, and then kicked him repeatedly.  Draper was wearing a shirt emblazoned with the letters "EKT" during the beating.  A video of the incident was posted on YouTube with the words "[f]*** the opps," "[c]ome errrr," and "wen u see

a n**** wit a EKT shirt." (Pl.'s Ex. N16, N19.) According to Detective Kirk, EKT members use the term "opps" to refer to "their enemies, people who oppose them." (Tr. Vol. VI at 1217.)

- On November 15, 2019, Fluellen confronted a man in a Wendy's restaurant because the man had disrespected Henry. Fluellen demanded the man "stop speaking on my n****," and then repeatedly punched and kicked him. (Pl.'s Ex. V.) Fluellen yelled "Terk Blocc," an EKT slogan, as he kicked the man. *Id.*

{¶ 7} In addition to engaging in criminal activities, the members of EKT support Fluellen's career as the rap artist "EKT 40." Fluellen has released a number of rap videos on YouTube under the name EKT 40, and five of those videos were admitted into evidence at trial. The videos feature EKT members holding and pointing firearms, as well as making gang symbols with their hands. These symbols include a "T" for "Terk," a "T" and "B" for "Terk Blocc," a "W" for "Windsor," a "C" for "Crip," and a "K" for "Killas." (Pl.'s Ex. Q4, R2, T2; Tr. Vol. V at 992; Tr. Vol. VI at 1272.) Both Lathon and Gardner appear in EKT 40's rap videos.

{¶ 8} Detective Kirk explained that Fluellen's rap lyrics often refer to real-life events. For example, in "Stop Playin," posted on YouTube on August 30, 2019, Fluellen rapped, "I know he pissed I took his shit, then I blew up." (Pl.'s Ex. S1.) This line refers to the grudge Alante Royal of Paper Chasin' Gorillas had against Fluellen because Fluellen robbed Paper Chasin' Gorillas' trap house before becoming a successful rapper. In the video "Sad to Say," posted on YouTube on September 28, 2019, Fluellen rapped that, "[t]he n****s be lyin out here and be fakin, that's the reason we be robbin and takin." (Pl.'s Ex. Q1.) As Detective Kirk testified, this verse also fits with Fluellen robbing the trap house.

{¶ 9} EKT's opposition did not only comprise Easthaven and Paper Chasin' Gorillas; it also included the Mound Over Berkley Bloods. On February 23, 2019, the car Fluellen was driving was sprayed with bullets during a drive-by shooting. Fluellen was not hit. William Campbell, a member of the Mound Over Berkley Bloods, was the suspected shooter.

{¶ 10} On October 19, 2019, Fluellen and eight other members of EKT, including Lathon and Gardner, encountered Campbell and some of his family members at Scene 75, an indoor entertainment complex at the Mall at Tuttle Crossing in Dublin. The two groups

verbally argued as the nine EKT members followed the Campbell family around Scene 75. When the two groups reached an area containing video and arcade games, the EKT members began to physically fight Campbell and his brother. When a Scene 75 employee tried to break up the fight, Lathon punched him. Within minutes, the fight was over, and everyone involved fled Scene 75. The fight, however, caused considerable chaos and panic among Scene 75 patrons, which included young children.

{¶ 11} On December 19, 2019, nine individuals, including Lathon and Gardner, were charged with multiple offenses arising out of the Scene 75 incident. The indictment charged Lathon and Gardner with: (1) participating in a criminal gang, a second-degree felony in violation of R.C. 2923.42; (2) aggravated riot, a fourth-degree felony in violation of R.C. 2917.02; (3) inducing panic, a fourth-degree felony in violation of R.C. 2917.31; and (4) assault, a first-degree misdemeanor in violation of R.C. 2903.13.

{¶ 12} Both Lathon and Gardner moved, pursuant to Crim.R. 14, to sever their cases from their codefendants' cases. The trial court denied these motions. In its judgments denying severance, the trial court stated that the state had determined that it would try each defendant with only one other co-defendant, given the COVID-related restrictions limiting the seating capacity in the courtroom. In the instant cases, the state decided to try Lathon and Gardner together. The trial court held that the interest of judicial economy outweighed any potential prejudice a joint trial might cause each defendant.

{¶ 13} The state moved, pursuant to Crim.R. 13(A), to join other indictments that were pending against Lathon and Gardner to the Scene 75 indictment. The state requested the trial court consolidate with the Scene 75 indictment four additional indictments in which Lathon was the defendant. In case Nos. 19CR-0008 and 19CR-0009, Lathon was charged in each case with one count of carrying a concealed weapon, a fourth-degree felony in violation of R.C. 2923.12, and one count of tampering with evidence, a third-degree felony in violation of R.C. 2921.12, with a firearm specification. In case Nos. 19CR-3120 and 19CR-3233, Lathon was charged in each case with one count of improper handling of a firearm in a motor vehicle ("improper handling of a firearm"), a fourth-degree felony in violation of R.C. 2923.16. In all these cases, police officers allegedly found a firearm, either hidden under a vehicle or under a vehicle seat, and linked that firearm to Lathon based on his proximity to it.

{¶ 14} Also, the state requested the trial court add one indictment that named Gardner as the defendant. In case No. 18CR-6143, Gardner was charged with: (1) improper handling of a firearm, a fourth-degree felony in violation of R.C. 2923.16; (2) failure to comply with an order or signal of a police officer ("failure to comply"), a third-degree felony in violation of R.C. 2921.331, with a firearm specification; (3) failure to comply, a fourth-degree felony in violation of R.C. 2921.331, with a firearm specification; (4) tampering with evidence, a third-degree felony in violation of R.C. 2921.12, with a firearm specification; and (5) having weapons while under disability, a third-degree felony in violation of R.C. 2923.13. This case resulted from allegations that Gardner led police on a high-speed chase, before fleeing on foot and tossing a firearm.

{¶ 15} The trial court granted the state's motions to join all Lathon's and Gardner's other indictments with the Scene 75 indictment. In its judgments granting the motions, the trial court concluded that the evidence of each defendant's gun-related case or cases would be admissible to prove an essential element of the charge that defendants had participated in a criminal gang. The trial court thus reasoned that joining the cases for trial did not prejudice each defendant's right to a fair trial.

{¶ 16} The parties tried all the charges, except the charge against Gardner for having weapons while under disability, to a jury. The jury found Gardner not guilty of assault, and it found Lathon not guilty of one count of tampering with evidence and one count of improper handling. On all other counts, the jury found defendants guilty. Additionally, the trial court found Gardner guilty of having weapons while under disability.

{¶ 17} Regarding Lathon, the trial court sentenced him to 5 years' imprisonment for Count 1 (participating in a criminal gang), 18 months' imprisonment for Count 2 (aggravated riot), 18 months' imprisonment for Count 3 (inducing panic), and 180 days' imprisonment for Count 4 (assault). The court ordered Counts 1 and 2 to run consecutively, and Counts 3 and 4 to run concurrently, for a total of 6.5 years' imprisonment. The trial court ordered that this sentence run consecutive to case Nos. 19CR-0008, 19CR-0009, and 19CR-3233.

{¶ 18} In case No. 19CR-0008, the trial court sentenced Lathon to serve 6 months for carrying a concealed weapon. In case No. 19CR-0009, the trial court sentenced Lathon to serve 12 months for Count 1 (carrying a concealed weapon), and 12 months for Count 2

(tampering with evidence), plus a 1-year mandatory term of imprisonment for the firearm specification. The trial court ordered that Lathon serve Counts 1 and 2 concurrently. In case No. 19CR-3233, the trial court sentenced Lathon to serve 6 months for improper handling of a firearm. In total, Lathon's prison sentence is 9.5 years.

{¶ 19} Regarding Gardner, the trial court sentenced him to 5 years' imprisonment for Count 1 (participating in a criminal gang), 18 months' imprisonment for Count 2 (aggravated riot), and 18 months' imprisonment for Count 3 (inducing panic). The court ordered Counts 1 and 2 to run consecutively for a total of 6.5 years' imprisonment. The trial court ordered that this sentence run consecutive to case No. 18CR-6143.

{¶ 20} In case No. 18CR-6143, the trial court sentenced Gardner to 12 months' imprisonment on Count 1 (improper handling of a firearm), 24 months' imprisonment on Count 2 (failure to comply), plus a 1-year mandatory term of imprisonment for the firearm specification, 18 months' imprisonment on Count 4 (tampering with evidence), and 24 months' imprisonment on Count 5 (having weapons while under disability). The trial court ordered Counts 2, 4, and 5 to run consecutively, for a total of 6.5 years' imprisonment. In total, Gardner's prison sentence is 13 years.

## II. ASSIGNMENTS OF ERROR

{¶ 21} Lathon now appeals his judgments of conviction and sentence, and he assigns the following errors:

> [1.] The Evidence on Count 1 Was Legally Insufficient to Support Conviction.
>
> [2.] Lathon's Trial Was Unfairly Prejudiced by the Joinder of His Firearms Means-of-Possession Cases With His Unrelated Gang Charge.
>
> [3.] Lathon Was Denied a Fair Trial Th[r]ough the Pervasive Introduction of Unfairly Prejudicial Other Bad Acts and Bad Character Evidence, that was Designed to Secure a Conviction Through Impermissible Propensity Reasoning.
>
> [4.] The Court Erred By Permitting Introduction of Unreliable Gang Identification Expert Testimony in Violation of Rule 702 and Constitutional Due Process, Requiring Reversal on Count 1.
>
> [5.] Lathon's Conviction on Count 1 Was Against the Manifest Weight of the Evidence.

[6.]     Lathon Was Denied His Right to a Fair Trial by Cumulative Error.

[7.]     Lathon is Impermissibly Sentenced to Multiple Punishments for the Same Conduct, in Violation of Jurisprudence on Allied Offenses of Similar Import and Constitutional Double Jeopardy.

[8.]     The Jury Did Not Find Beyond a Reasonable Doubt the 'Purposely Promote/Commit' Essential Element of Count 1, Violating Defendants' Constitutional Right to Due Process of Law.

[9.]     The Conviction and Sentence on Count 7 Must be Reversed, as Lathon was Acquitted of that Charge at Trial.

{¶ 22} Gardner also appeals his judgments of conviction and sentence, and he assigns the following errors:

[1.]     Because the criminal gang activity statute requires the State prove the following, the State's evidence was legally insufficient as a matter of law for two reasons:

A.     The State's evidence was legally insufficient because the State did not prove, even in a light most favorable to it, that Gardner actively participated in a criminal gang and knew that at least three members of EKT engaged in a pattern of criminal gang activity.

B.     The State's evidence was legally insufficient because the State did not prove, even in a light most favorable to it, that there was a nexus between Gardner's knowledge of EKT's criminal gang activity, and his criminal conduct.

[2.]     Gardner's motion for severance of his 2018 case from Gardner's 2019 gang case should have been granted, and since he was prejudiced by joinder, reversal is required.

[3.]     Gardner's convictions should be reversed because unfair prejudice through the introduction of other acts evidence occurred, denying Gardner's right to a fair trial.

[4.]     Gardner's convictions should be reversed because his counsel was ineffective, resulting in prejudice to Gardner.

[5.]     Because the evidence weighed manifestly against convicting Gardner, Gardner's convictions should be reversed.

[6.]     Gardner was denied his right to a fair trial in this case because of cumulative error.

[7.]     Gardner's sentences should be reversed because:

Gardner's offenses from 2018 merged with the predicate 2019 gang activity offense, and the trial court should have also merged Gardner's 2019 indicted offenses together.

The trial court's decision to run Gardner's 2018 and 2019 cases consecutively was contrary to law.

## III. LEGAL ANALYSIS

{¶ 23} Because Lathon's and Gardner's assignments of error significantly overlap, we will address them together. When necessary, we will specify those instances in which we review an assignment of error or argument only one defendant raises.

### A. FIRST ASSIGNMENTS OF ERROR – Sufficiency of the Evidence

{¶ 24} By their first assignments of error, Lathon and Gardner argue that the evidence is not legally sufficient to prove their convictions for participating in a criminal gang. We disagree.

{¶ 25} " 'Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict.' " *State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, ¶ 23, quoting *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two the syllabus, *superseded by state constitutional amendment on other grounds as stated in Smith* at 102, fn. 4. "[A]n appellate court does not ask whether the evidence should be believed but, rather, whether the evidence, 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.' " *State v. Pountney*, 152 Ohio St.3d 474, 2018-Ohio-22, ¶ 19, quoting *Jenks* at paragraph two of the syllabus.

{¶ 26} R.C. 2923.42, the statute under which Lathon and Gardner were convicted, prohibits participation in a criminal gang. It states:

(A) No person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall purposely promote, further, or assist any criminal conduct, as defined in division (C) of section 2923.41 of the Revised Code, or shall purposely commit or engage in any act that constitutes

criminal conduct, as defined in division (C) of section 2923.41
of the Revised Code.

**{¶ 27}** Given the language of the statute, the elements of the offense of participating in a criminal gang are: (1) a criminal gang existed (the criminal gang element); (2) in which the defendant actively participated (the active participation element); (3) with knowledge that the criminal gang engaged in, or had engaged in, a pattern of criminal gang activity (the knowledge element); and (4) the defendant either purposely promoted, furthered, or assisted any criminal conduct, or himself purposely committed or engaged in criminal conduct (the individual conduct element). *State v. Allen*, 10th Dist. No. 11AP-1130, 2013-Ohio-513, ¶ 28.

### 1. The Criminal Gang Element

**{¶ 28}** R.C. 2923.41(A) defines a "criminal gang" as:

[A]n ongoing formal or informal organization, association, or group of three or more persons to which all of the following apply:

(1) It has as one of its primary activities the commission of one or more of the offenses listed in division (B) of this section.[1]

(2) It has a common name or one or more common, identifying signs, symbols, or colors.

(3) The persons in the organization, association, or group individually or collectively engage in or have engaged in a pattern of criminal gang activity.

**{¶ 29}** Gardner does not challenge the sufficiency of the state's evidence as to the criminal gang element. Lathon, however, maintains that the state did not establish the first prong of the definition of "criminal gang." According to Lathon, there is insufficient evidence that EKT had as one of its primary activities the commission of one or more of the offenses listed in R.C. 2923.41(B).

**{¶ 30}** Although no Ohio court has interpreted R.C. 2923.41(A)(1), the Supreme Court of California has construed the meaning of a similarly worded section of the California Street Terrorism Enforcement and Prevention Act of 1988 ("the STEP Act"). The STEP Act, as enacted in 1988, defined a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one

---

[1] While we quote R.C. 2923.41(B) in its entirety below, we merely note at this juncture that the offenses listed in R.C. 2923.41(B) include "offense[s] of violence." R.C. 2923.41(B)(1)(b).

of its primary activities the commission of one or more of [certain enumerated] criminal acts." Cal.Penal Code 186.22(f). The Supreme Court of California held that:

> The phrase "primary activities," as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's "chief" or "principal" occupations. (See Webster's Internat. Dict. (2d ed. 1942) p. 1963 [defining "primary"].) That definition would necessarily exclude the occasional commission of those crimes by the group's members.

*People v. Sengpadychith*, 26 Cal.4th 316, 323 (2001).

{¶ 31} The court additionally stated that, "[s]ufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently* and *repeatedly* have committed criminal activity listed in the gang statute." (Emphasis sic.) *Id*. at 324. Sufficient proof might also be found in expert testimony regarding the gang's primary activities. *Id*.

{¶ 32} As we stated above, to constitute a "criminal gang" under R.C. 2923.41(A)(1), an organization, association, or group must have "as one of its primary activities the commission of one or more of the offenses listed in division (B)" of R.C. 2923.41. The statutory definition of "criminal street gang" in the 1988 STEP Act required an organization, association, or group to have "as one of its primary activities the commission of one or more of [certain enumerated] criminal acts." Cal.Penal Code 186.22(f). Given the virtually identical statutory language in Ohio and California law, we apply the construction of "primary activities" articulated in *Sengpadychith* to R.C. 2923.41(A)(1).

{¶ 33} Here, the state did not provide expert testimony that identified any criminal activity listed in R.C. 2923.41(B) as one of EKT's primary activities. However, the state posited to the jury in its closing argument that one of EKT's primary activities was engaging in assault, which is an offense of violence. Indeed, assault, felonious assault, and aggravated assault are all offenses of violence. R.C. 2901.01(A)(9)(a) (defining "offense of violence" to include R.C. 2903.11, felonious assault; R.C. 2903.12, aggravated assault; and R.C. 2903.13, assault). Offenses of violence are offenses listed in R.C. 2923.41(B).

{¶ 34} Confusingly, the state pointed to offenses that occurred before EKT existed to prove that one of EKT's primary activities was assault. According to Officer Alex Kistner, the Columbus Division of Police did not see EKT "pop up" until Fluellen was released from

juvenile detention in 2015, after the end of his confinement for the reckless homicide of Henry.[2] (Tr. Vol. V at 1003.) Consequently, offenses that occurred prior to 2015 could not demonstrate the primary activities of EKT, as the gang had yet to form. As best we can discern, the state contended otherwise because it believed it had established EKT as "a successor group to the Windsor Terrace Posse [] and/or Banger Squad." (Aug. 22, 2023 Appellee's Brief at 12.) Thus, the state counted criminal offenses committed by members of Windsor Terrace Posse or the Banger Squad before 2015 as proving EKT's primary activities. We need not determine the legal efficacy of the state's argument because the evidence fails to show that EKT succeeded Windsor Terrace Posse or the Banger Squad.

{¶ 35} A "successor" is "[s]omeone who succeeds to the office, rights, responsibilities, or place of another; one who replaces or follows a predecessor." *Black's Law Dictionary* (12th Ed.2024). Detective Kirk, the state's expert witness, testified that both EKT and the Banger Squad are subsets of Windsor Terrace Posse, the set. Detective Kirk explained that younger members of Windsor Terrace Posse broke off to form the Banger Squad and then later, another group, EKT. Detective Kirk likened the relationship between set and subsets to major league and minor league baseball teams. Consistent with the analogy, just like minor league teams are separate but affiliated with the major league teams, subsets are separate but affiliated with sets. Likewise, just like minor league teams are separate but affiliated with other minor league teams, the subsets are also separate but affiliated with other subsets. Given this affiliated-but-separate relationship, neither EKT nor the Banger Squad is a successor to Windsor Terrace Posse, and EKT is not a successor to the Banger Squad.

{¶ 36} This non-successor relationship between the three gangs is supported by Officer Kistner's testimony. Officer Kistner was asked if it was correct that "the Windsor Terrace Posse became the Banger Squad, then became EKT." (Tr. Vol. V at 1016.) Officer Kistner answered, "I wouldn't say they 'became.' I would just say that Windsor Terrace Posse, then some members became Banger Squad, then some became EKT. I wouldn't say that Windsor Terrace dissolved into these different groups." *Id.* This sequence of events

---

[2] Officer Kistner's testimony is consistent with Detective Kirk's recollection that EKT "was created a few years after Terrico Henry, street name King Terk, was shot and killed" in January 2014. (Tr. Vol. VI at 1176.)

does not establish EKT as a successor for either Windsor Terrace Posse or the Banger Squad.

{¶ 37} We, consequently, discount the offenses committed prior to 2015 in determining EKT's primary activities. Nevertheless, we conclude that the remaining evidence establishes assault as one of EKT's primary activities. The state presented evidence of multiple instances where EKT members engaged in fights, often with rival gang members or in response to a perceived insult. In 2015, Draper was adjudicated a delinquent minor for the offense of felonious assault when he shot at someone for disrespecting a deceased gang member. Webster was convicted of aggravated assault for shooting another person in the leg in 2016. On January 1, 2018, EKT members fought with a rival gang at the Red Club, which led to Fluellen suffering a gunshot. In 2019, Lathon was one of four EKT members who beat an Easthaven member at the Ohio State Fair. Also in 2019, nine EKT members punched and kicked Campbell and his brother at Scene 75. Finally, Fluellen attacked a man at Wendy's because he insulted Henry in 2019.

{¶ 38} Based on these incidents, we conclude that the evidence proves that EKT members consistently and repeatedly committed assaults, which are offenses of violence. Thus, the state established that one of EKT's primary activities is engaging in a criminal activity listed in R.C. 2923.41(B).

**2. The Active Participation Element**

{¶ 39} Both Lathon and Gardner argue that the state failed to prove that they actively participated in EKT. We disagree.

{¶ 40} Active participation in a criminal gang requires involvement that is more than merely nominal or passive. *State v. Taylor*, 9th Dist. No. 10CA009922, 2012-Ohio-1263, ¶ 84; *State v. Coe*, 5th Dist. No. 2009 CA 00050, 2010-Ohio-1840, ¶ 55. The gang participation statute does not " 'punish nominal, inactive[,] purely technical, or passive membership.' " *Allen*, 2013-Ohio-513, at ¶ 39, quoting *State v. Williams*, 148 Ohio App.3d 473, 2002-Ohio-3777, ¶ 35 (10th Dist.).

{¶ 41} Detective Kirk, the state's expert witness, testified that Lathon and Gardner were enforcers for EKT. Enforcers carry firearms, but unlike shooters or trigger pullers, have not demonstrated a willingness to shoot someone.

{¶ 42}  To show Lathon's and Gardner's active participation in EKT, the state produced multiple social media posts.  Lathon and Gardner, as well as other EKT members, posted photographs and comments to social media sites, such as Instagram, demonstrating their affiliation with EKT and their involvement in gang activity.  The social media posts depict Lathon and Gardner fulfilling their enforcer roles with EKT.

{¶ 43}  In Exhibit N9, Lathon and Gardner pose with other members of EKT.  Lathon has a firearm in his pants and is making a "T" for "Terk" hand sign.  In Exhibit N12, Lathon and Gardner again pose with other members of EKT.  Lathon points a firearm at the camera, and Gardner uses his hands to sign "TB" for "Terk Blocc."  Exhibit L1 is a photograph Lathon posted to Instagram of him with other EKT members.  He and three others have firearms in their possession.  In Exhibit L2, another photograph Lathon posted to Instagram, both Lathon and Gardner pose with other EKT members.  Lathon and Gardner both have firearms.  Exhibit L5, a third photograph posted by Lathon to Instagram, shows Lathon pointing firearms at the camera with each hand.  Exhibit L7 depicts Gardner in an EKT t-shirt holding a firearm with an extended magazine.  In response to this photograph, Gardner, using the name ekt_shondoe, wrote, "U kno[w] I'm ridin wit it[;] if them n****s kill me[,] then I'm dyin wit it. #EKT"  (Emojis omitted.) (Pl.'s Ex. L7.)  In response to another photograph posted to Instagram of multiple EKT members, including Lathon and Gardner, Gardner commented, "Real shooters/real shooters."  (Emojis omitted.) (Pl.'s Ex. L8.)  In Exhibit L9, Gardner appears with a semi-automatic firearm in his pants.  Exhibit L11 shows Lathon with another EKT member, Marcus Gordon.  Casket emojis partially obscure the firearms Lathon and Gordon each have in their pants.  In response to the post of that photograph, Lathon, using the name jdk_pistol_j, wrote, "Don't think I'm slippin[;] try your luck[,] you f*** around [and] get killed twice [] #Ekt []."  (Pl.'s Ex. L11.)

{¶ 44}  Both Lathon and Gardner appear in EKT 40's rap videos with other EKT members.  The video for "Snake" begins with a close-up shot on Gardner's large neck tattoo of "EKT."  (Pl.'s Ex. R.)  In the videos for "Sad to Say" and "Yeah," Lathon brandishes firearms.  (Pl.'s Ex. Q & U.)  In the video for "Snake," Lathon gives the "C" hand sign for "Crips."  (Pl.'s Ex. R.)  In the video for "Yeah," he makes the "W" hand sign for "Windsor."  (Pl.'s Ex. U.)

{¶ 45} Most importantly, the jury convicted both Lathon and Gardner of offenses related to their possession of firearms. Neither defendant contests the sufficiency of the evidence regarding their convictions for carrying a concealed weapon or improper handling of a firearm. Again, by carrying firearms, Lathon and Gardner were performing their duties as EKT enforcers.

{¶ 46} Moreover, Lathon also actively participated in EKT when he joined three other EKT members in beating a member of a rival gang at the Ohio State Fair in July 2019. The posting of a video of the beating on social media included comments indicating that attack was motivated by EKT's animus for the victim's gang.

{¶ 47} Given all the foregoing evidence, we conclude the state presented sufficient evidence to support the jury's conclusion that Lathon and Gardner actively participated in EKT.

### 3. The Knowledge Element

{¶ 48} Lathon and Gardner argue that the evidence does not prove they knew that EKT engaged in a pattern of criminal activity. We disagree.

{¶ 49} For an individual to be culpable for participating in a criminal gang, the individual must have "knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity." R.C. 2923.42(A). Criminal gang members' offenses must satisfy multiple criteria to meet the definition of "pattern of criminal gang activity." *See* R.C. 2923.41(B). First, pursuant to R.C. 2923.41(B)(1):

> [P]ersons in the criminal gang [must] have committed, attempted to commit, conspired to commit, been complicitors in the commission of, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of two or more of any of the following offenses:
>
> (a) A felony or an act committed by a juvenile that would be a felony if committed by an adult;
>
> (b) An offense of violence or an act committed by a juvenile that would be an offense of violence if committed by an adult;
>
> (c) A violation of [certain enumerated offenses].

{¶ 50} Second, under R.C. 2923.41(B)(2), to qualify as a "pattern of criminal gang activity":

[A]ll of the following [must] apply with respect to the offenses that are listed in division (B)(1)(a), (b), or (c) of [R.C. 2923.41] and that persons in the criminal gang committed, attempted to commit, conspired to commit, were in complicity in committing, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in committing:

(a) At least one of the two or more offenses is a felony.

(b) At least one of those two or more offenses occurs on or after January 1, 1999.

(c) The last of those two or more offenses occurs within five years after at least one of those offenses.

(d) The two or more offenses are committed on separate occasions or by two or more persons.

{¶ 51} Thus, to satisfy the definition of a "pattern of criminal gang activity": (1) persons in the criminal gang must have committed or otherwise been involved in the commission of two or more felonies, offenses of violence, or certain enumerated offenses; (2) at least one the offenses must be a felony; (3) at least one of the offenses must have occurred after January 1, 1999; (4) the last of the offenses must occur within five years after at least one of the offenses; and (5) two or more of the offenses must be committed on separate occasions or by two or more persons.

{¶ 52} Both Lathon and Gardner misconstrue the type of knowledge R.C. 2923.42(A) requires. They believe that an accused is not culpable under R.C. 2923.42(A) unless he knows that a criminal gang exists. R.C. 2923.42(A), instead, mandates that the accused know that a pattern of criminal gang activity exists. *State v. Reese*, 6th Dist. No. L-20-1111, 2021-Ohio-3506, ¶ 62 ("[T]he third element involve[es] appellant's knowledge that the * * * gang engages in or has engaged in a pattern of criminal gang activity."); *Allen*, 2013-Ohio-513, at ¶ 42 ("The third element of the crime of criminal gang participation is that the accused knew that the gang * * * engaged in a pattern of criminal gang activity.").

{¶ 53} The state argues that Lathon's and Gardner's knowledge of offenses resulting from the Scene 75 incident establishes the knowledge element for both Lathon and Gardner. We disagree. In its entirety, R.C. 2923.42(A) states that "[n]o person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall," stated simply, purposely commit "criminal conduct." When statutory language is plain and unambiguous, and conveys a

clear and definite meaning, a court gives it the construction that its words demand. *State v. Reed*, 162 Ohio St.3d 554, 2020-Ohio-4255, ¶ 13. Given the plain and unambiguous language of R.C. 2923.42(A), an accused is culpable for purposely committing "criminal conduct" if he or she acts "with knowledge" of the gang's "pattern of criminal gang activity." For the requisite knowledge to arise, the "pattern of criminal gang activity" must consist of offenses that occurred before the accused's "criminal conduct" (activity the "gang engaged in") or concurrently with the accused's "criminal conduct" (activity the "gang engages in").

{¶ 54} In this case, the indictment charging Lathon and Gardner with gang participation specified the criminal conduct that allegedly satisfied the individual conduct element. According to the indictment, the criminal conduct that violated R.C. 2923.42 was aggravated riot and inducing panic, as alleged in Counts 2 and 3 of the indictment. Counts 2 and 3 charged Lathon and Gardner for their actions during the Scene 75 brawl.

{¶ 55} Logically, Lathon and Gardner could not commit the Scene 75 offenses having knowledge of a pattern of criminal gang activity premised on the Scene 75 offenses. A defendant must possess the necessary knowledge at the time he or she commits the criminal conduct, so the defendant must acquire that knowledge before the criminal conduct occurs. *See State v. Woodbridge*, 153 Ohio App.3d 121, 2003-Ohio-2931, ¶ 43 (7th Dist.) (holding that R.C. 2923.42 "limits criminal liability to active gang members who possess knowledge of the gang's criminal objectives and, *armed with that knowledge*," commit criminal conduct.) (Emphasis added.). Thus, the state had to rely on offenses other than the Scene 75 offenses to show that Lathon and Gardner had knowledge of EKT's alleged pattern of criminal gang activity.

{¶ 56} "A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). The state can prove knowledge with either direct or circumstantial evidence. *State v. Jordan*, 174 Ohio St.3d 347, 2023-Ohio-3800, ¶ 26.

{¶ 57} As we stated above, Lathon does not contest that the evidence establishes that he twice committed the offense of carrying a concealed weapon and once committed the offense of improper handling of a firearm. Additionally, the evidence proves that Lathon, along with three other EKT members, assaulted a member of the Easthaven gang at the Ohio State Fair. As the perpetrator of these offenses, Lathon clearly had knowledge of

them.  These offenses are either felonies or offenses of violence, they all occurred after January 1, 1999, and the last of the offenses occurred within five years after at least one of the offenses.  Finally, Lathon committed all four of the offenses on separate occasions.  Therefore, Lathon's offenses constitute a pattern of criminal gang activity.[3]  The state thus produced sufficient evidence Lathon knew that EKT engaged in a pattern of criminal gang activity.

{¶ 58}  Like Lathon, Gardner does not contest that he committed the offense of improper handling of a firearm.  Gardner also does not dispute that he committed other offenses during and after his high-speed chase, including failure to comply, tampering with evidence, and having weapons while under disability.  Gardner, as the perpetrator of these offenses, clearly had knowledge of them.

{¶ 59}  Additionally, the state produced circumstantial evidence that Gardner was aware of additional crimes committed by EKT members.  EKT members exposed their criminal exploits on social media.  Fluellen bragged in an online video chat about robbing a trap house owned by a rival gang and taking $100,000.  Fluellen referred to the robbery in his music, rapping, "I know he pissed I took his shit, then I blew up," (Pl.'s Ex. S1.), and "[t]he n***** be lyin out here and fakin, that's the reason we be robbin and takin."  (Pl.'s Ex. Q1.)  A video of EKT members, including Lathon, beating a rival gang member at the Ohio State Fair also appeared on social media.  According to the evidence offered by the state, Gardner was active on social media: he responded to EKT-related social media posts and messaged other EKT members.  Consequently, it is reasonable to infer that Gardner knew of the robbery Fluellen committed and the assault Lathon committed.

{¶ 60}  Robbery, assault, and the offenses arising from the high-speed chase are all either felonies or offenses of violence; all the offenses occurred after January 1, 1999; and the last of the offenses occurred within five years after at least one of the offenses.  Finally, the robbery, assault, and the offenses arising from the high-speed chase occurred on separate occasions.  Therefore, these offenses constitute a pattern of criminal gang activity.

---

[3] Although Lathon was not convicted of assault for the beating at the Ohio State Fair, "R.C. 2923.41(B) does not require that there be a conviction of any of the R.C. 2923.41(B)(1) predicate offenses to support a finding of a 'pattern of criminal gang activity.' "  *State v. Kyles*, 12th Dist. No. CA2021-11-141, 2023-Ohio-489, ¶ 108.

The state thus produced sufficient evidence that Gardner knew that EKT engaged in a pattern of criminal gang activity.

### 4. The Individual Conduct Element

{¶ 61} Lathon and Gardner argue that the state failed to produce evidence to satisfy the individual conduct element of the offense of participating in a criminal gang. We disagree.

{¶ 62} Under the individual conduct element, as provided in R.C. 2923.42(A), an individual must either "purposely promote, further, or assist any criminal conduct" or "purposely commit or engage in any act that constitutes criminal conduct." "A person acts purposely when it is the person's specific intention to cause a certain result." R.C. 2901.22(A). "Criminal conduct" is:

> [T]he commission of, an attempt to commit, a conspiracy to commit, complicity in the commission of, or solicitation, coercion, or intimidation of another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of an offense listed in division (B)(1)(a), (b), or (c) of [R.C. 2923.41] or an act that is committed by a juvenile and that would be an offense, an attempt to commit an offense, a conspiracy to commit an offense, complicity in the commission of, or solicitation, coercion, or intimidation of another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of an offense listed in division (B)(1)(a), (b), or (c) of [R.C. 2923.41] if committed by an adult.

R.C. 2923.41(C).

{¶ 63} In determining the constitutionality of R.C. 2923.42, this court refined the last element of the offense of participating in a criminal gang. We held, "The statute requires that the active member with guilty knowledge has specific intent or purpose to further the group's criminal conduct before they may be prosecuted." *Williams*, 2002-Ohio-3777, at ¶ 17. Later in our decision, we reiterated, "R.C. 2923.42 requires a person knowingly and actively participate in the criminal gang and have the specific intent to further the gang's unlawful goals before that person may be prosecuted." *Id*. at ¶ 19. Based on this interpretation of R.C. 2923.42, we concluded that the statute did not violate the First and Fourteenth Amendments to the United States Constitution or Article I, Section 3 of the Ohio Constitution by establishing guilt by association alone.

{¶ 64} Our holding in *Williams* recognized that R.C. 2923.42 requires proof that the accused is an active gang member (the active participation element) with guilty knowledge (the knowledge element). Regarding the individual conduct element, *Williams* held that R.C. 2923.42 also requires proof that the accused have a specific intent or purpose to further the criminal gang's criminal conduct or goals. Consequently, to prove the fourth element of the gang participation offense, the state must demonstrate that an accused purposely promoted, furthered, assisted, committed, or engaged in criminal conduct with the specific intent to aid or advance the gang's criminal activities or goals. In other words, there must be a nexus between the accused's criminal conduct and the gang's criminal activity or goals.

{¶ 65} When grappling with the constitutionality R.C. 2923.42, other Ohio appellate courts concurred with our reading of the statute. The Seventh District Court of Appeals held that R.C. 2923.42 "require[es] that the participant must be acting with knowledge of the gang's activities and with specific intent to further those illegal activities and interests." *Woodbridge*, 2003-Ohio-2931, at ¶ 35. Similarly, the Ninth District Court of Appeals concluded that "the State may not prosecute an individual unless he has the specific intent or purpose to further the gang's criminal actions." *State v. Stallings*, 150 Ohio App.3d 5, 2002-Ohio-5942, ¶ 19 (9th Dist.).

{¶ 66} As we stated above, the indictment charging Lathon and Gardner with the gang participation offense specified that aggravated riot and inducing panic was the criminal conduct that allegedly satisfied the individual conduct element. In these appeals, neither Lathon nor Gardner contests that the evidence proves that he purposely committed aggravated riot and inducing panic. Moreover, neither defendant challenges that aggravated riot and inducing panic constitute "criminal conduct" as defined by R.C. 2923.41(C). Although Gardner contends a nexus must exist between an accused's criminal conduct and a gang's criminal activities or goals, he does not argue that the state failed to prove that nexus with regard to aggravated riot and inducing panic. Lathon, however, asserts that the state did not establish that he engaged in aggravated riot and inducing panic with the specific intent to aid or advance EKT's criminal activity or goals.

{¶ 67} According to the evidence, there was ongoing antagonism between Fluellen and Campbell, a member of rival gang the Mound Over Berkley Bloods, that arose because Fluellen suspected Campbell committed the drive-by shooting that Fluellen survived.

When nine EKT members, including Fluellen, encountered Campbell and his brother at Scene 75, they confronted them. The video of this confrontation captures Fluellen saying "Terk" forcefully. (Pl.'s Ex. F.) After a verbal dispute, EKT members punched and kicked Campbell and his brother.

{¶ 68} In telephone conversations recorded when Lathon was jailed after his arrest, Lathon said that "[t]he only problem [he] had with that n**** [Campell] was the problem [his] n**** [Fluellen] had with that n**** [Campbell]." (Pl.'s Ex. J2.) Even though Lathon did not have any personal conflict with Campbell, he joined in the fight because "that's what you supposed to do." (Pl.'s Ex. J1; Tr. Vol. VII at 1361.) As Lathon put it, "I'm a loyal n****." (Pl.'s Ex. J2.)

{¶ 69} Based on the evidence, we conclude that Lathon felt an obligation to participate in the attack on Campbell because Campbell became an adversary of all EKT members once he shot at Fluellen. The beating of Campbell and his brother furthered EKT's criminal activities because it avenged the drive-by shooting of an EKT member. Thus, the evidence establishes that Lathon engaged in aggravated riot and inducing panic with the specific intent to advance EKT's criminal activities.

{¶ 70} After reviewing the evidence in a light most favorable to the prosecution, we conclude a rational trier of fact could have found the elements of the offense of participating in a criminal gang proven beyond a reasonable doubt in both Lathon's and Gardner's cases. Accordingly, we overrule Lathon's and Gardner's first assignments of error.

## B. FIFTH ASSIGNMENTS OF ERROR – Manifest Weight

{¶ 71} We next address Lathon's and Gardner's fifth assignments of error. By those assignments of error, Lathon and Gardner argue that their convictions for participating in a criminal gang are against the manifest weight of the evidence. We disagree.

{¶ 72} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving the conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "Sitting as the 'thirteenth juror,' the court of appeals

considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion." *Jordan*, 174 Ohio St.3d 347, 2023-Ohio-3800, at ¶ 17. However, the appellate court's authority to reverse on manifest-weight grounds " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

**{¶ 73}** As we discussed above, the record contains evidence establishing all elements of the gang participation offense against both Lathon and Gardner. Defendants now argue that this evidence is neither weighty nor credible enough to support their convictions. In making this argument, defendants merely reiterate arguments they made in asserting that the evidence was not sufficient to support their convictions. We have addressed and rejected those arguments.

**{¶ 74}** The weight to be given evidence and the credibility of witnesses are primarily jury issues. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, ¶ 155. In this case, the jury believed the state's evidence. We conclude that the jury neither lost its way nor created a miscarriage of justice in convicting Lathon and Gardner of participating in a criminal gang. Accordingly, we overrule Lathon's and Gardner's fifth assignments of error.

### C. SECOND ASSIGNMENTS OF ERROR – Joinder of Multiple Offenses in a Single Indictment

**{¶ 75}** By their second assignments of error, Lathon and Gardner argue that the trial court erred in joining their indictments for trial. We disagree.

**{¶ 76}** The trial court has the authority to join multiple indictments for a consolidated trial pursuant to Crim.R. 13. That rule states, "The court may order two or more indictments * * * to be tried together, if the offenses * * * could have been joined in a single indictment." Crim.R. 8(A) describes the circumstances under which multiple offenses may be joined in a single indictment. Under that rule:

> Two or more offenses may be charged in the same indictment * * * if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

**{¶ 77}** " 'The law favors joining multiple criminal offenses in a single trial.' " *State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, ¶ 18, quoting *State v. Franklin*, 62 Ohio

St.3d 118, 122 (1991). Permitting joinder "conserves resources by avoiding duplication inherent in multiple trials and minimizes the possibility of incongruous results that can occur in successive trials before different juries." *State v. Hamblin*, 37 Ohio St.3d 153, 158 (1988). Appellate courts review a trial court's decision on joinder of offenses for trial under the abuse-of-discretion standard. *State v. Parham*, 10th Dist. No. 16AP-826, 2019-Ohio-358, ¶ 20.

{¶ 78} In this case, the state moved, pursuant to Crim.R. 8(A) and 13, to join Lathan's and Gardner's "gun cases" with the "gang case." As we explained above, Lathon had four "gun indictments": two charging him with carrying a concealed weapon and tampering with evidence, and two charging him with the improper handling of a firearm. Gardner had one "gun indictment" that charged him with the improper handling of a firearm, two counts of failure to comply, tampering with evidence, and having weapons while under disability.

### 1. Lathon's Argument – Error in Joining Offenses Under Crim.R. 8(A)

{¶ 79} Lathon argues that the trial court erred in joining his gun and gang indictments because the evidence of the offenses did not interlock. Offenses are "part of a course of criminal conduct," thus justifying joinder under Crim.R. 8(A), when evidence of the offenses interlocks and the offenses occur in physical and temporal proximity to each other. *Hamblin* at 158; *State v. Davenport*, 8th Dist. No. 112004, 2023-Ohio-2953, ¶ 28. Crim.R. 8(A), however, permits joinder for reasons other than the charged offenses are "part of a course of criminal conduct." A court may also join multiple offenses in the same indictment when the offenses "are based on two or more acts * * * connected together." Crim.R. 8(A).

{¶ 80} Here, the acts underlying all Lathon's offenses are connected together because Lathon committed those acts while he was an EKT member. Therefore, as we explained above, the state could use Lathon's gun offenses to prove a "pattern of criminal gang activity," as defined in R.C. 2923.41(B), and Lathon's knowledge of that pattern. The gun cases thus share a connection with the gang case, permitting joinder under Crim.R. 8(A). Given this connection, the trial court did not abuse its discretion in joining Lathon's gun and gang indictments.

**{¶ 81}**  Lathon argues the state could not use the gun cases to prove a pattern of criminal gang activity because his gun cases (with one exception) did not involve other gang members and none of the gun cases involved gang business.  But an offense may constitute part of a pattern of criminal gang activity even if it does not involve other gang members or gang business.  Neither the participation of other gang members nor a connection to gang business is a mandatory requirement of the offenses that may constitute "a pattern of criminal gang activity" as defined in R.C. 2923.41(B).[4]  Consequently, we are not persuaded by Lathon's argument.

### 2. Gardner's Argument – Error in Failing to Sever Under Crim.R. 14

**{¶ 82}**  Gardner makes a different argument than Lathon.  Gardner argues that the trial court erred in denying his motion to sever, and the joinder of his two indictments prejudiced him.

**{¶ 83}**  Even if Crim.R. 8(A) and 13 sanction the joinder of indictments for trial, a trial court should nevertheless order separate trials pursuant to Crim.R. 14 if the defendant establishes that joinder prejudices him or her.  *Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, at ¶ 20.  Importantly, in order to obtain severance under Crim.R. 14, the defendant " 'has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial.' "  *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, ¶ 104, quoting *State v. Torres*, 66 Ohio St.2d 340, 343 (1981).

**{¶ 84}**  Trial courts have considerable discretion in determining whether severance is warranted, and an appellate court will not reverse a trial court's decision to deny severance absent an abuse of discretion.  *State v. N.S.*, 10th Dist. No. 20AP-66, 2020-Ohio-5318, ¶ 32.  Where, however, a defendant has "neither sought severance pursuant to Crim.R. 14 nor objected to the joinder, [an appellate court does] not review the trial court's decision for an abuse of discretion; instead, * * * on appeal [the appellate court applies] a

---

[4] We recognize that a "pattern of criminal gang activity" does not exist unless the evidence establishes "two or more offenses are committed on separate occasions *or by two or more persons*."  (Emphasis added.)  R.C. 2923.41(B)(2)(d).  Therefore, offenses committed by multiple gang members may comprise a pattern of criminal gang activity, but a pattern of criminal gang activity may also arise without such offenses, based solely upon offenses committed on separate occasions.  In short, the participation of other gang members in an offense is a sufficient but not necessary condition for a pattern of criminal gang activity to exist.

plain-error standard of review to the trial court's decision regarding joinder." *Gordon* at ¶ 22.

{¶ 85} Although Gardner moved to sever, that motion sought severance of Gardner's case from his codefendants' cases. Gardner never sought to sever his gun indictment from the gang indictment. Moreover, unlike Lathon, Gardner never objected to the joinder of his gun and gang indictments. Gardner did not file a memorandum in opposition to the state's motion for joinder. Additionally, when given the opportunity to respond to the state's joinder motion at a motion hearing, Gardner's attorney only argued the merits of the motion to sever Gardner's case from his codefendants' cases. The trial court record, therefore, contains no information from Gardner establishing that joinder of the offenses prejudiced him. Gardner purported to preserve the joinder-of-offenses issue at the close of the state's case, but Gardner cannot preserve an issue he failed to properly raise. *See State v. Harder*, 8th Dist. No. 112051, 2023-Ohio-2384, ¶ 10 (holding that the defendant's "attempt to 'renew' his nonexistent objection [to joinder] on the morning of trial, in which he solely rested on the 'previously filed' arguments, was insufficient to preserve the issue for further review on the merits"). Consequently, we apply the plain-error standard of review to Gardner's arguments.

{¶ 86} To prevail under the plain-error standard, a defendant must show that an error occurred, the error was obvious, and there is a reasonable probability that the error resulted in prejudice, meaning that the error affected the outcome of the trial. *State v. Bailey*, 171 Ohio St.3d 486, 2022-Ohio-4407, ¶ 8. An appellate court has discretion to notice plain error and will correct such error only under exceptional circumstances to prevent injustice. *State v. Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, ¶ 17.

{¶ 87} On appeal, Gardner argues that he was prejudiced by the joinder of his two indictments because the evidence of the high-speed police chase would have been inadmissible in his gang case. We are not persuaded by this argument. Gardner was an EKT member when he fled from the police and tossed the gun he was carrying. The state, therefore, could use evidence of the offenses that occurred during the high-speed chase and gun dump to prove a "pattern of criminal gang activity," as defined in R.C. 2923.41(B), and Gardner's knowledge of that pattern.

{¶ 88}   Gardner argues that his gun offenses do not prove a pattern of criminal gang activity because he did not commit them with another member of EKT.   However, as we explained above, under R.C. 2923.41(B), offenses may constitute part of a "pattern of criminal gang activity" even without the involvement of multiple gang members.

{¶ 89}   Gardner also contends that evidence of his gun offenses is other-acts evidence that is inadmissible under Evid.R. 404(B).   We disagree.   Pursuant to Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."   Former Evid.R. 404(B) (effective July 1, 2012 through June 30, 2022).[5]   However, other-acts evidence is admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."   *Id.*   Moreover, other-acts evidence is admissible if it is relevant to prove an element of an offense.   *State v. Ludwick*, 4th Dist. No. 21CA17, 2022-Ohio-2609, ¶ 44; *State v. Ruggles*, 12th Dist. No. CA2019-05-038, 2020-Ohio-2886, ¶ 64; *State v. Savola*, 8th Dist. No. 108829, 2020-Ohio-1389, ¶ 21; *State v. Baughman*, 6th Dist. No. L-11-1045, 2012-Ohio-5327, ¶ 16; *State v. Krzywkowski*, 8th Dist. No. 80392, 2002-Ohio-4438, ¶ 45; *State v. Schilling*, 5th Dist. No. 2001 AP 01 0001, 2002-Ohio-775; *see also State v. Wade*, 10th Dist. No. 22AP-560, 2023-Ohio-3490, ¶ 62 (holding that a trial court properly admits other-acts evidence to prove an element of a gang specification).   Here, where the state used the other-acts evidence to prove elements of the gang participation offense, Evid.R. 404(B) did not bar the admission of the other-acts evidence.

{¶ 90}   Gardner, therefore, failed to prove any prejudice from the joinder of his indictments.   Without prejudice to justify severance, the trial court could not commit plain error in trying Gardner's cases together.

---

[5]  Evid.R. 404(B) was revised in 2022.  Effective July 1, 2022, the rule reads in relevant part:

**(B)      Other crimes, wrongs, or acts**

(1)  Prohibited uses.  Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2)  Permitted uses; notice.  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

{¶ 91}   In sum, we conclude that the trial court did not err in joining Lathon's and Gardner's indictments for a single trial.  We thus overrule Lathon's and Gardner's second assignments of error.

### D. THIRD ASSIGNMENTS OF ERROR – Admission of Other-Acts Evidence

{¶ 92}   By their third assignments of error, Lathon and Gardner argue that the trial court erred in allowing the state to introduce other-acts evidence.

{¶ 93}   "Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime."  *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, ¶ 36.   Such evidence, however, may be admissible for a non-character-based purpose.  *Id.*  The key to the admissibility of other-acts evidence is that "the evidence must prove something other than the defendant's disposition to commit certain acts."  *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 22.

{¶ 94}   In this case, Lathon and Gardner largely contend that the trial court erred by allowing the state to introduce evidence of criminal or bad acts committed by other individuals.  But Evid.R. 404(B) "prohibits evidence of a *defendant's* other acts" to preclude a factfinder from finding guilt by reasoning the defendant acted in accordance with his or her bad character or a proclivity toward criminality.  (Emphasis added.) *Smith*, 2020-Ohio-4441, at ¶ 36; *accord State v. Stewart*, 10th Dist. No. 19AP-615, 2020-Ohio-5344, ¶ 30, quoting *State v. Jeffers*, 10th Dist. No. 09AP-358, 2007-Ohio-3213, ¶ 6   (holding that, pursuant to Evid.R. 404(B), " '[a]n accused cannot be convicted of one crime by proving he committed other crimes or is a bad person' ").  Evid.R. 404(B) does not preclude evidence of other people's crimes, wrongs, or acts.  Evidence of someone else's acts simply does not demonstrate the *defendant's* character or propensity to commit the same or similar acts.  Thus, Evid.R. 404(B) does not exclude evidence of third parties' other acts.

{¶ 95}   Moreover, we cannot agree with Lathon and Gardner that the state argued to the jury that they were guilty of participating in a criminal gang merely because they associated with people who committed criminal or wrongful acts.  The state introduced much of the evidence Lathon and Gardner dispute in order to prove the elements of the gang participation offense.  The state adduced evidence of other EKT members' crimes to show that EKT was a "criminal gang," as defined in R.C. 2923.41(A), and EKT members

engaged in a "pattern of criminal gang activity," as defined in R.C. 2923.41(B).  Evidence of other gang members' offenses is relevant for those purposes.  *See State v. Bias*, 10th Dist. No. 21AP-329, 2022-Ohio-4643, ¶ 138 (holding that evidence of crimes committed by other gang members was relevant to prove a pattern of criminal gang activity).

**{¶ 96}**   Lathon also argues that the trial court erred in admitting into evidence an organizational chart that Detective Kirk created of EKT.  The chart includes two pages of photographs of EKT members, including Lathon. (Pl.'s Ex. H1-4.)  On one page, Lathon's photograph, along with other EKT members' photographs, appears under the label "Enforcers."  On a second page, Lathon's photograph, along with other EKT members' photographs, appears under the label "Shooters/Enforcers." (Pl.'s Ex. H2.)  Detective Kirk also referred to "shooters" as "trigger pullers" in his testimony. (Tr. Vol. VI at 1295.)  Lathon contends that the organizational chart and Detective Kirk's testimony amounts to impermissible Evid.R. 404(B) evidence.

**{¶ 97}**   Although Lathon challenges this evidence on appeal, he did not object to it at trial.  Thus, Lathon has waived all but plain error.  *See State v. Speer*, 10th Dist. No. 12AP-893, 2013-Ohio-5444, ¶ 10 (failure to object to other-acts evidence waives all but plain error).

**{¶ 98}**   In his testimony, Detective Kirk explained that "shooters" and "enforcers" are distinct roles in a gang.  A shooter is "[s]omebody willing to pull the trigger, to shoot somebody." (Tr. Vol. VI at 1216.)  In contrast, an enforcer carries a gun, but "back[s] away from pulling the trigger." (Tr. Vol. VI at 1296.)

**{¶ 99}**   Undisputed evidence at trial established that Lathon carried a firearm. Lathon does not contest that the record contains sufficient evidence to convict him of two counts of carrying a concealed weapon and one count of improper handling of a firearm. However, there is no evidence in the record that Lathon ever shot a firearm.  Consequently, Lathon fit the role of an enforcer for EKT, as reflected by the label given to him in Exhibit H1.  By categorizing Lathon as an enforcer, Detective Kirk did not give evidence of any prior bad acts, but relied on evidence already admitted to opine as to Lathon's role within the gang.

**{¶ 100}** In Exhibit H2, Lathon's photograph appears with photographs of five other EKT members under the label "Enforcers/Shooters."  The slash punctuation mark between

"Enforcers" and "Shooters" means "or." *See Knous v. United States*, 683 Fed.Appx. 859, 864 (11th Cir.2017) (holding that "[c]ourts have repeatedly recognized that a slash, solidus, or virgule is used to separate alternatives"). Thus, the EKT members shown in Exhibit H2 are either enforcers *or* shooters. Exhibit H2 includes photographs of Draper and Webster, who both qualify as shooters according to the evidence adduced in this case. Lathon, on the other hand, qualifies as an enforcer under the evidence.

{¶ 101} In sum, neither the organizational chart nor Detective Kirk's testimony introduced any impermissible other-acts evidence. In defining Lathon's enforcer role in EKT, Detective Kirk did not imply Lathon committed any act other than carry a firearm, which Lathon does not dispute the record had already established. The trial court, therefore, did not commit error, much less plain error, in admitting the evidence.

{¶ 102} Gardner argues that the trial court erred in admitting evidence that he was arrested on July 28, 2018 for driving without a valid driver's license. Gardner contends that evidence of this prior criminal act was inadmissible under Evid.R. 404(B).

{¶ 103} Gardner failed to object to the admission of the evidence regarding his unlawful driving, so he has waived all but plain error. *See Speer*, 2013-Ohio-5444, at ¶ 10. The state argues that Gardner cannot show plain error because his unlawful driving is evidence that proves the offense of participating in a criminal gang. We are not persuaded.

{¶ 104} In determining whether to admit other-acts evidence, a court must first evaluate whether the evidence is relevant to the nonpropensity purpose for which it is offered. *Hartman*, 2020-Ohio-4440, at ¶ 26. As we explained above, a court may admit other-acts evidence to prove an element of an offense. *Ludwick*, 2022-Ohio-2609, at ¶ 44; *Ruggles*, 2020-Ohio-2886, at ¶ 64; *Savola*, 2020-Ohio-1389, at ¶ 21; *Baughman*, 2012-Ohio-5327, at ¶ 16; *Krzywkowski*, 2002-Ohio-4438, at ¶ 45; *Schilling*, 2002-Ohio-775. The state asserts that Gardner's arrest for operating a motor vehicle without a valid license proved that persons in EKT individually or collectively engaged in a pattern of criminal gang activity, a necessary element to establish the existence of a criminal gang.

{¶ 105} In short, a "pattern of criminal gang activity" requires the commission or other involvement in two or more felonies, offenses of violence, or specifically enumerated offenses. R.C. 2923.41(B)(1). Operating a motor vehicle without a valid license in violation of R.C. 4510.12 is, at most, a first-degree misdemeanor. R.C. 4510.12(C)(1) and (2).

Furthermore, a violation of R.C. 4510.12 is neither an offense of violence nor one of the offenses enumerated in R.C. 2923.41(B)(1)(c). Thus, the offense of operating a motor vehicle without a valid license cannot prove a pattern of criminal gang activity. Evidence of Gardner's unlawful driving, therefore, is not relevant to prove that he participated in a criminal gang. Consequently, the trial court should have excluded that evidence under Evid.R. 404(B).

{¶ 106} Gardner, however, has not demonstrated that the outcome of the trial would have been different without the evidence that Gardner was arrested for driving without a valid driver's license. Evidence in the record establishes that EKT was a criminal gang in which Gardner actively participated with knowledge that EKT had engaged in a pattern of criminal gang activity, and that Gardner purposely engaged in aggravated riot and inducing panic with the specific intent to advance EKT's criminal activities or goals. Given the ample evidence in the record supporting Gardner's conviction for participating in a criminal gang, the admission of evidence of Gardner's arrest does not constitute plain error.

{¶ 107} In sum, neither Lathon nor Gardner has presented this court with a reason to reverse his convictions based on the admission of other-acts evidence in violation of Evid.R. 404(B). Accordingly, we overrule the third assignments of error.

### E. LATHON'S FOURTH ASSIGNMENT OF ERROR – Admission of Witness Testimony

{¶ 108} By Lathon's fourth assignment of error, he argues that the trial court erred in permitting Detective Kirk and Officer Kistner to testify.

### 1. Admission of Detective Kirk as an Expert Witness

{¶ 109} First, Lathon contends that the trial court erred in allowing Detective Kirk to testify as an expert witness in the identification of criminal gangs. Lathon maintains that Detective Kirk lacked the necessary specialized knowledge, experience, and training to testify as an expert witness, and his testimony was not based on reliable information. We disagree.

{¶ 110} "Expert-witness testimony is generally admissible 'if it will assist the trier of fact in search of the truth.'" *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 161, quoting *State v. Koss*, 49 Ohio St.3d 213, 216 (1990). Evid.R. 702 sets forth the circumstances under which expert testimony is admissible. Pursuant to that rule, "[a] witness may testify as an expert if * * * all of the following apply":

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information.

{¶ 111} A trial court has broad discretion in determining the admissibility of expert testimony. *State v. Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, ¶ 87. An appellate court reviews a trial court's admission of expert testimony for an abuse of discretion. *McKelton* at ¶ 161.

{¶ 112} A witness may testify as an expert under Evid.R. 702(B) as long as he or she possesses specialized knowledge that will aid the trier of fact in performing its fact-finding function. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 144. Qualification as an expert witness does not require complete knowledge of the field in question or special education or certification. *Id.* Indeed, the requirements of Evid.R. 702(B) may be met by on-the-job training and experience. *State v. Krowiak*, 9th Dist. No. 21CA0003-M, 2022-Ohio-413, ¶ 46. Moreover, "a police officer may be qualified as an expert on gangs if he has gained knowledge and experience about gangs through investigating gang activities and if his testimony shows that he possesses specialized knowledge about gang symbols, cultures, and traditions, beyond that of the trier of fact." *State v. Hairston*, 10th Dist. No. 08AP-735, 2009-Ohio-2346, ¶ 58; *accord State v. McCraney*, 9th Dist. No. 24750, 2010-Ohio-6128, ¶ 24 (holding the same).

{¶ 113} Detective Kirk testified that he works in two capacities for the Columbus Division of Police. He is a patrol officer in the Linden area and, additionally, he is a detective in the Criminal Intelligence Unit ("CIU"), often called the "gang unit."[6] The CIU gathers information about Central Ohio gangs and disseminates that information throughout the Columbus Division of Police. Detective Kirk explained that he works both as a patrol officer and as a CIU detective because "[a] lot of times when you leave the street,

---

[6] Lathon disputes whether Detective Kirk is a detective in the CIU. However, Detective Kirk unambiguously testified, "I've been able to stay in patrol, assigned to patrol, *but also work as a Gang Unit detective*." (Emphasis added.) (Tr. Vol. VI at 1134.)

you lose your connections, you lose a lot of, you know, intel that you get from working the street." (Tr. Vol. VI at 1134.)

{¶ 114} Detective Kirk has patrolled the Linden area for over a decade, and he has been a CIU detective for 8 to 9 years. When he started working for the CIU, he received training from more senior detectives. He has also attended training courses regarding gangs and narcotics. Detective Kirk has been the lead investigator in 20 to 30 cases, including narcotics, gang, and weapons cases. He has completed two gang investigations in which he documented the members in the gangs. In total, Detective Kirk has documented approximately 40 to 50 gang members. The Columbus Division of Police awarded Detective Kirk a medal of merit for his work in the two gang cases.

{¶ 115} Lathon complains that Detective Kirk does not have any previous qualifications or certifications as a gang expert, federal training in gang activity, or college classwork or degree. However, no specific credential or education is necessary for a witness to qualify as an expert witness. *State v. Conn*, 6th Dist. No. OT-14-018, 2015-Ohio-1989, ¶ 21. Detective Kirk's testimony demonstrated that he possesses specialized knowledge, experience, and training as to gang-related matters. The trial court, therefore, did not abuse its discretion in finding him qualified to testify as an expert witness on those matters.

{¶ 116} Under Evid.R. 702(C), a trial court exercises the role of gatekeeper by assessing the reliability of an expert's methodology before permitting the expert to testify. *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, ¶ 24. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the United States Supreme Court developed four factors to test the reliability of expert testimony based on scientific information. *Id.* at 592-93. Subsequently, the United States Supreme Court extended the application of these factors to test the reliability of all expert testimony, including testimony based on technical and other specialized knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). In doing so, the court emphasized that the *Daubert* inquiry is flexible and the "list of factors [is] meant to be helpful, not definitive." *Id.* at 150, 151.

{¶ 117} The Supreme Court of Ohio has adopted the four-factor *Daubert* test to determine reliability. *Terry* at ¶ 25. However, the Supreme Court of Ohio has declined to apply the *Daubert* factors to gang-related testimony. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 119; *accord State v. Humberto*, 196 Ohio App.3d, 2011-Ohio-3080,

¶ 31 (10th Dist.) (holding "[t]he Supreme Court of Ohio refused to apply the *Daubert* factors to gang-related testimony"); *State v. Peterson*, 10th Dist. No. 07AP-303, 2008-Ohio-2838, ¶ 32 (10th Dist.) (quoting *Drummond* and stating "the Ohio Supreme Court has rejected the view that 'the *Daubert* factors (peer review, publication, potential error rate, etc.)' apply to gang-related testimony").

{¶ 118} In *Drummond*, the Supreme Court of Ohio stated that, "unlike scientific testimony, expert testimony about gangs depends heavily on the expert's knowledge and experience rather than on the expert's methodology and theory." *Id.* at ¶ 119. Consequently, to review whether the trial court erred in finding the gang expert's testimony reliable, the Supreme Court examined the expert's knowledge and experience, which the court found sufficient to make his testimony reliable. *Id.* at ¶ 120. Using this alternative means to measure reliability is consistent with *Kumho Tire*, which recognized that depending on the type of expert and expertise at issue, "the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* at 150.

{¶ 119} Here, Detective Kirk based his testimony on his knowledge and experience in investigating Columbus-area gangs and gang members. We thus conclude that the trial court did not abuse its discretion in determining that Detective Kirk's testimony was reliable.

### 2. Admission of Officer Kistner's Testimony

{¶ 120} Lathon next argues that the trial court erred in allowing Officer Kistner to testify to expert opinions, even though the trial court did not admit him as an expert witness. We, however, do not find any expert opinions in Officer Kistner's testimony.

{¶ 121} Officer Kistner testified that he began working as a patrol officer in the Linden area in June 2013. Approximately one year prior, he was working as a patrol officer on the east side of Columbus when he started observing and documenting members of a gang called the Elaine Gangster Crips for the CIU. When Officer Kistner transferred to the Linden area, he monitored the activities of a different gang, the Waun Squad, which formed after the death of Kaewaun Coleman. In addition to the Waun Squad, Officer Kistner interacted with members of Windsor Terrace Posse and the Banger Squad. Officer Kistner documented these interactions for the CIU, and he described the interactions for the jury.

{¶ 122} Although Lathon objected to Officer Kistner's testimony, he did not challenge that testimony on the grounds that it contained expert opinions. Lathon, instead, asserted objections based on relevancy and prejudice. The trial court overruled Lathon's objections.

{¶ 123} An objection on one ground does not preserve for appeal other, unmentioned grounds. *Bias*, 2022-Ohio-4643, at ¶ 116; *State v. Petty*, 10th Dist. No. 15AP-950, 2017-Ohio-1062, ¶ 49. Consequently, we review the trial court's admission of Officer Kistner's testimony for plain error.

{¶ 124} Lathon complains that Officer Kistner opined about the history, progression, and activities of gangs, but in actuality Officer Kistner testified as to what he observed gang members saying and doing. In short, Officer Kistner testified from his personal knowledge.

{¶ 125} " 'Personal knowledge' is 'knowledge gained through firsthand observation or experience.' " *Bonacorsi v. Wheeling & Lake Erie Ry. Co.*, 95 Ohio St.3d 314, 2002-Ohio-2220, ¶ 26, quoting *Black's Law Dictionary* (7th Ed.Rev.1999). "All witnesses may testify as to facts within their personal knowledge." *State v. Hemmelgarn*, 2d Dist. No. 2018-CA-7, 2019-Ohio-2034, ¶ 34, citing Evid.R. 602.

{¶ 126} Because Officer Kistner testified to facts within his personal knowledge, and not expert opinions, he did not need to qualify as an expert witness under Evid.R. 702. The trial court, therefore, did not commit plain error in admitting Officer Kistner's testimony.

{¶ 127} In sum, we are not persuaded that the trial court erred in admitting either Detective Kirk's or Officer Kistner's testimony. Accordingly, we overrule Lathon's fourth assignment of error.

### F. GARDNER'S FOURTH ASSIGNMENT OF ERROR – Ineffective Assistance of Counsel

{¶ 128} By Gardner's fourth assignment of error, he argues that he was deprived of effective assistance of trial counsel. We disagree.

{¶ 129} To prevail on an ineffective assistance claim, a defendant must meet the two-prong test set out in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. *Strickland* at 687; *State v. Bradley*, 42 Ohio St.3d 136, 141 (1989). To meet that requirement, the defendant must demonstrate that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland* at 687. Counsel's conduct is deficient if

it falls below an objective standard of reasonable representation. *Strickland* at 688; *Bradley* at 142.

{¶ 130} If the defendant shows that counsel's performance was deficient, then the second prong of the *Strickland* test requires the defendant to prove prejudice to prevail. *Strickland* at 687; *Bradley* at 141-42. To demonstrate prejudice, the defendant must show "that there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694; *accord Bradley* at 142.

### 1. Failure to Object to Officer Kistner's Testimony

{¶ 131} Gardner first argues that his counsel was ineffective because she did not object to Officer Kistner's testimony on the basis that he provided expert opinion testimony, even though he was not admitted as an expert witness. Trial counsel is not ineffective for failing to object to admissible testimony. *State v. Rudasill*, 10th Dist. No. 19AP-61, 2021-Ohio-45, ¶ 48; *State v. Daniels*, 10th Dist. No. 14AP-326, 2015-Ohio-2649, ¶ 32. As we found above, Officer Kistner provided admissible testimony. Consequently, Gardner's counsel was not ineffective for failing to object to it.

### 2. Failure to Object to Detective Kirk's Testimony

{¶ 132} Second, Gardner contends that his counsel was ineffective for not objecting to portions of Detective Kirk's testimony. Gardner initially argues that his counsel should have objected to the other-acts evidence Detective Kirk testified about. Detective Kirk spoke about the criminal and wrongful acts of people other than Lathon and Gardner, which, as we explained above, Evid.R. 404(B) does not exclude from evidence. Accordingly, Gardner's counsel was not ineffective for failing to object to the alleged other-acts testimony.

{¶ 133} Next, Gardner maintains that his counsel was ineffective for not objecting to Detective Kirk's testimony regarding the Crips, Windsor Terrace Posse, and the Banger Squad because this evidence was irrelevant. We are not persuaded.

{¶ 134} The failure to object, alone, is not enough to sustain a claim of ineffective assistance of counsel. *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, ¶ 117. Withholding an objection may be a tactical decision because:

> "[E]xperienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice."

*State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir.2006).

{¶ 135} Initially, Detective Kirk testified about the Crips, Windsor Terrace Posse, and the Banger Squad to explain the genesis of EKT. Detective Kirk then identified members of the Banger Squad in a photograph and spoke about an incident in which shots were fired between members of the Banger Squad and a rival gang, the T&A Crips, on September 7, 2013.

{¶ 136} Evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. In order to show EKT was a "criminal gang," as defined in R.C. 2923.41(A), the state had to prove EKT had "a common name or one or more common, identifying signs, symbols, or colors." R.C. 2923.41(A)(2). To do that, the state introduced evidence that EKT gang members would make "C" hand signs for "Crips" and "W" hand signs for "Windsor." For the jury to understand the significance of these signs, it needed to know about EKT's relationship to the Crips and Windsor Terrace Posse. Detective Kirk's testimony regarding this relationship, therefore, was relevant evidence, and did not merit an objection.

{¶ 137} With regard to the Banger Squad, Lathon objected that evidence of the September 7, 2013 incident was irrelevant. Lathon pointed out that the September 7, 2013 incident, as well as other incidents Detective Kirk had testified about, predated the indictment period, which was June 13, 2018 to December 18, 2019. In response, the state argued that it introduced this evidence to prove that EKT was a criminal gang. The trial court overruled Lathon's objection.

{¶ 138} Given that Lathon's objection was unsuccessful, Gardner's counsel could have made a tactical decision to forego an objection to the same testimony on similar grounds.[7] In any event, evidence of the September 7, 2013 incident is not so prejudicial that it essentially defaulted the case to the state. The incident did not involve Gardner or EKT.

{¶ 139} Finally, Gardner contends that his counsel was ineffective for not objecting when Detective Kirk opined as to what certain language in R.C. 2923.42 meant. Although an expert witness cannot opine on the law's meaning, Detective Kirk did not violate this prohibition.

{¶ 140} "The interpretation of the law is the sole province of the court, not the expert witness." *Hahn v. Jennings*, 10th Dist. No. 04AP-24, 2004-Ohio-4789, ¶ 17. Thus, an expert witness goes too far when he or she tells the jury "what the statute allegedly 'says.' " *Kraynak v. Youngstown City School Dist. Bd. of Edn.*, 118 Ohio St.3d 400, 2008-Ohio-2618, ¶ 20; *accord Fickle v. Conversion Technologies Internatl., Inc.*, 6th Dist. No. WM-10-016, 2011-Ohio-2960, ¶ 26 (holding that statutory terms are not susceptible to definition by an expert witness).

{¶ 141} In this case, Detective Kirk did not testify as to the meaning of the law. He, instead, opined that "incidents back starting in about 2013 leading up to the history of EKT" "[w]ould * * * be part of documenting a pattern in this case." (Tr. Vol. VII at 1371.) Additionally, he told jurors that Lathon was an active member of EKT between June 13, 2018 and November 15, 2019, based on Lathon's frequent documented association with known gang members, his criminal activity, and his statements in his jail calls. He also stated that Gardner was an active member of EKT between June 13, 2018 and November 15, 2019, based on Gardner's frequent documented association with known gang members, his criminal activity, and his gang-related tattoo.

{¶ 142} In short, Detective Kirk did not try to explain to the jury what R.C. 2923.42 meant by the terms "actively participates" or "a pattern of criminal gang activity." He gave his opinion about what the evidence proved. Gardner's counsel, therefore, could not object on the ground that Detective Kirk was instructing the jury on the law, and she was not ineffective for failing to assert such an objection.

---

[7] Because the Banger Squad predated EKT, evidence about its members' crimes preceded EKT's formation. Thus, an objection on the ground that the evidence involved the Banger Squad was comparable to an objection based on untimeliness.

### 3. Failure to Object to Instagram Messages and Jail Calls

{¶ 143} Gardner argues that his counsel should have objected to two Instagram messages Gardner posted on the basis that the state introduced them into evidence without first authenticating them. We are not persuaded.

{¶ 144} Exhibits are properly authenticated when the record contains "evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). The threshold for authentication is low: the proponent of the evidence need not offer conclusive proof as a foundation but must merely offer a sufficient basis to allow the question of authenticity to reach the jury. *State v. McCarrel*, 10th Dist. No. 18AP-660, 2019-Ohio-2984, ¶ 37; *State v. Caslin*, 10th Dist. No. 17AP-613, 2018-Ohio-5362, ¶ 21. Evidence of postings on social media accounts may be authenticated by a law enforcement officer who testifies that he or she obtained the evidence pursuant to a search warrant served on the owner of the social media website. *State v. A.W.M.*, 10th Dist. No. 18AP-523, 2020-Ohio-4707, ¶ 118 (holding that screenshots from the defendant's Facebook account were authenticated through a detective's testimony that he obtained the defendant's Facebook account information through a search warrant); *State v. Garcia-Toro*, 8th Dist. No. 107940, 2019-Ohio-5336, ¶ 30 (holding that screenshots of text communications and video chats were authenticated by a detective's testimony that he obtained that evidence via a search warrant served on Facebook).

{¶ 145} In this case, Gardner complains that the state failed to authenticate two different exhibits that contain messages Gardner left on Instagram. However, Detective Kirk testified that he obtained those messages by serving a search warrant on Instagram that sought copies of all material posted to the accounts of certain, identified EKT members. Through this testimony, Detective Kirk authenticated Gardner's messages, thus precluding an objection. Gardner's counsel, therefore, was not ineffective for failing to object.

{¶ 146} Gardner also asserts that his counsel was ineffective for not objecting to the state's introduction of recordings of phone calls Lathon made to others while he was in jail after his arrest. Gardner contends that his counsel should have objected and argued that admission of Lathon's jail calls violated Gardner's Sixth Amendment right to confrontation.

{¶ 147} The admission of testimonial statements made by a witness who does not appear at trial violates the Confrontation Clause, unless the witness "was unavailable to

testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). Only testimonial hearsay implicates the Confrontation Clause. *Id.* at 59, fn. 9; *McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, at ¶ 185. Testimonial statements are statements made for the primary purpose of creating an out-of-court substitute for trial testimony. *McKelton* at ¶ 185.

{¶ 148} In this case, although Gardner asserts in his appellate brief that the "[j]ail calls were admitted despite confrontation[-]clause issues," he does not further elaborate. (Gardner's Appellate Brief at 52.) Most importantly, he fails to articulate why the jail calls constituted testimonial hearsay.

{¶ 149} The party asserting error must carry the burden of affirmatively demonstrating that error on appeal. *State v. I.T.*, 10th Dist. No. 23AP-694, 2024-Ohio-2182, ¶ 20; *State v. Hillman*, 10th Dist. No. 01AP-750, 2002-Ohio-4760, ¶ 10. Pursuant to App.R. 16(A)(7), an appellant must present an argument containing his or her contentions with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities on which the appellant relies. It is not appropriate for this court to construct the legal arguments in support of an appellant's assignments of error. *I.T.* at ¶ 20; *State v. Bell*, 10th Dist. No. 19AP-627, 2020-Ohio-1397, ¶ 7; *State v. Coogan*, 10th Dist. No. 18AP-829, 2019-Ohio-3016, ¶ 14.

{¶ 150} Gardner presented this court with no argument regarding why Lathon's jail calls amounted to testimonial hearsay. Consequently, we do not address his argument that his counsel was ineffective in failing to object on confrontation-clause grounds.

{¶ 151} In sum, Gardner has failed to demonstrate that his trial counsel provided ineffective assistance. Accordingly, we overrule Gardner's fourth assignment of error.

### G. LATHON'S EIGHTH ASSIGNMENT OF ERROR – Jury Instructions

{¶ 152} By his eighth assignment of error, Lathon argues that the trial court erred in how it instructed the jury on the individual conduct element of the offense of participating in a criminal gang. According to Lathon, the jury instructions violated his due process rights because they resulted in a conviction for the gang participation offense without a jury determination that he was guilty of the individual conduct element of that offense beyond a reasonable doubt.

{¶ 153} As we stated above, the offense of participating in a criminal gang has four elements: (1) a criminal gang existed (the criminal gang element); (2) in which the defendant actively participated (the active participation element); (3) with knowledge that the criminal gang engaged in, or had engaged in, a pattern of criminal gang activity (the knowledge element); and (4) the defendant either purposely promoted, furthered, or assisted any criminal conduct, or himself purposely committed or engaged criminal conduct, with the specific intent to aid or advance the gang's criminal activities or goals (the individual conduct element). *Allen*, 2013-Ohio-513, at ¶ 28; *Williams*, 2002-Ohio-3777, at ¶ 12, 15.

{¶ 154} Under Crim.R. 30(A), "[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." When a defendant fails to make such an objection, he or she waives all but plain error. *State v. Owens*, 162 Ohio St.3d 596, 2020-Ohio-4616, ¶ 7.

{¶ 155} In this case, Lathon contends that he objected before the jury retired on the grounds he now asserts on appeal. We disagree. When discussing the jury instructions, Lathon asked the trial court to explain to the jury that active participation required the accused to perform some role to benefit the gang. In other words, Lathon argued to the trial court that the instruction on the second element of the offense was insufficient. Now, on appeal, Lathon attacks the jury instruction on the fourth element—the individual conduct element.

{¶ 156} However, as Lathon points out, a formal objection is not always necessary to preserve an objection under Crim.R. 30(A). *State v. Wolons*, 44 Ohio St.3d 64 (1989), paragraph one of the syllabus. A party does not waive his or her objections to the trial court's charge by failing to formally object where: (1) "the record affirmatively shows that a trial court has been fully apprised of the correct law governing a material issue in dispute, and (2) the requesting party has been unsuccessful in obtaining the inclusion of that law in the trial court's charge to the jury." *Id.*

{¶ 157} Lathon asserts that he "fully apprised" the trial court of the correct law at issue by filing proposed jury instructions before the trial. The jury instructions Lathon proposed recommended that the trial court instruct the jury that, "[n]o person who actively

participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall purposely promote, further, or assist in any criminal conduct, or shall purposely commit or engage in any act that constitutes criminal conduct." (June 14, 2021 Def.'s Proposed Jury Instructions at 4.) Although this instruction correctly quoted R.C. 2923.41(A), it omitted that the jury must find the elements of the gang participation offense beyond a reasonable doubt. The instruction also left out the requirement that the defendant must purposely promote, further, assist, commit, or engage in criminal conduct with the specific intent to aid or advance the gang's criminal activity or goals. Lathon's proposed instruction, therefore, did not "fully apprise" the trial court of the correct law governing the material issue now in dispute. Consequently, we apply the plain-error standard to Lathon's argument.

{¶ 158} The Fourteenth Amendment right to due process and the Sixth Amendment right to a trial by jury entitle a criminal defendant to a jury determination that he or she is guilty of every element of every offense charged, beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000). Jury instructions that relieve the state of its burden to prove every element of a charged offense beyond a reasonable doubt violate a defendant's due process rights. *Carella v. California*, 491 U.S. 263, 265 (1989); *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, ¶ 97.

{¶ 159} Regarding the offense of participating in a criminal gang, the trial court instructed the jury:

> Defendants are each charged with participating in a criminal gang in Count 1 of the indictment.
>
> Before you can find the defendant guilty of participating in a criminal gang, you must find beyond a reasonable doubt that on or about June 13, 2018, and December 18, 2019, the defendant actively participated in a criminal gang, to-wit: Crips and/or Windsor Terrace Posse and/or Banger Squad and/or Everything King Terk, with the knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity.

(Tr. Vol. VIII at 1682-83.)

{¶ 160} The trial court then: (1) provided the jury with the statutory definition of criminal gang; (2) informed the jury that assault was an offense of violence; (3) defined

assault, attempt, cause, and a pattern of criminal gang activity; (4) listed multiple offenses that qualified as felonies; and (5) defined knowing. After that litany, the trial court stated:

> Participating means actively participating[:] [w]hile knowing the gang was engaging in criminal activity, the defendant purposely promoted, furthered, or assisted the criminal conduct, or purposely engaged in criminal conduct himself.

(*Id.* at 1686; *see also* June 22, 2021 Jury Instructions at 9.)

{¶ 161} When initially instructing the jury on the offense of participating in a criminal gang, the trial court failed to inform the jury of all the elements of the offense. In setting out the elements the jury had to find beyond a reasonable doubt, the trial court told the jury only about three elements: the criminal gang, active participation, and knowledge elements. The trial court omitted any mention of the individual conduct element, i.e., the purposeful commission of criminal conduct with a specific intent to further the gang's activities or goals. Then, after a myriad of other instructions, the trial court informed that jury that "actively participating" in a gang meant "purposely promoting, furthering, assisting, or engaging in criminal conduct" while knowing of the gang's criminal activity.

{¶ 162} This instruction failed to correctly state the law for two reasons: (1) it erroneously conflated the second and fourth elements of the offense,[8] and (2) it did not inform the jury that the accused must purposely promote, further, assist, commit, or engage in the criminal conduct with the specific intent to advance the gang's criminal activities or goals. We, therefore, agree with Lathon that the trial court erred in instructing the jury on the offense of participating in a criminal gang. Moreover, as the jury was not fully instructed on the fourth element of the offense, it could not find all parts of that element beyond a reasonable doubt, thus violating Lathon's right to due process.

{¶ 163} We thus turn to the question of whether Lathon has established plain error. To do that, Lathon must show there is a reasonable probability that the erroneous jury instructions resulted in prejudice, meaning that the error affected the outcome of the trial. *Bailey*, 171 Ohio St.3d 486, 2022-Ohio-4407, at ¶ 8. As we held above, the evidence the state presented at trial that proved that Lathon committed the offense of participating in a

---

[8] It appears that the trial court may have also intended to merge the third element with the second and fourth elements. However, instead of telling the jury the accused needed knowledge of a "pattern of criminal gang activity," the trial court instructed the jury that the accused had to know "the gang was engaging in criminal activity." (Tr. Vol. VIII at 1586.) Thus, in addition to the other issues discussed above, this instruction deviated from the language of R.C. 2923.42.

criminal gang: while actively participating in EKT, a criminal gang, with knowledge that EKT engaged in a pattern of criminal gang activity, Lathon purposely engaged in criminal conduct—aggravated riot and inducing panic—with the specific intent to advance EKT's criminal activities. Lathon argues that he was prejudiced because the state never had to demonstrate a nexus between his improper handling and concealed carry offenses and criminal gang activity. But the state never had this burden. The indictment identifies aggravated riot and inducing panic as the offenses that constitute the criminal conduct that fulfills the individual conduct element of the gang participation offense. Thus, the state had to establish that Lathon engaged in aggravated riot and inducing panic with the specific intent to further EKT's criminal activities or goals. As we discussed above, the evidence proves the Lathon had the necessary intent. Lathon, therefore, has not shown prejudice. Accordingly, we overrule Lathon's eighth assignment of error.

### H. SIXTH ASSIGNMENTS OF ERROR – Cumulative Error

{¶ 164} By their sixth assignments of error, Lathon and Gardner argue that this court should reverse their convictions based on the doctrine of cumulative error. We disagree.

{¶ 165} Under the doctrine of cumulative error, an appellate court "will reverse a conviction when the cumulative effect of errors deprives a defendant of a fair trial even though each instance of trial-court error does not individually constitute cause for reversal." *State v. Whitaker*, 169 Ohio St.3d 647, 2022-Ohio-2840, ¶ 174. But before an appellate court may find cumulative error, it must first conclude that multiple errors were committed at trial. *State v. Blanton*, 171 Ohio St.3d 19, 2022-Ohio-3985, ¶ 80.

{¶ 166} In this case, Lathon has established only one of the errors he has alleged. Likewise, Gardner has established one harmless error. As neither Lathon nor Gardner have demonstrated multiple errors committed at trial, their claims for relief under the doctrine of cumulative error must fail. Accordingly, we overrule the sixth assignments of error.

### I. NINTH ASSIGNMENT OF ERROR – Sentencing on an Acquitted Charge

{¶ 167} By his ninth assignment of error, Lathon argues that the trial court erred by sentencing him to a prison term for an offense on which he was acquitted. We agree.

{¶ 168} As we explained above, the state consolidated additional indictments against Lathon with the "gang indictment." In case Nos. 19CR-0008 and 19CR-0009, Lathon was charged in each case with one count of carrying a concealed weapon and one count of

tampering with evidence, with a firearm specification. In the jury instructions, the trial court instructed the jury that the charges in case No. 19CR-0009, which resulted from a July 31, 2018 traffic stop, were Count 6 (carrying a concealed weapon) and Count 7 (tampering with evidence). The court told the jury that the charges in case No. 19CR-0008, which resulted from an August 6, 2018 traffic stop, were Count 8 (carrying a concealed weapon) and Count 9 (tampering with evidence). The jury found Lathon guilty of Counts 6, 8, and 9, and not guilty of Count 7. Thus, the jury found Lathon not guilty of the charge of tampering with the evidence in case No. 19CR-0009.

{¶ 169} However, when the trial court sentenced Lathon, it misstated the jury's verdicts in the judgments for case Nos. 19CR-0008 and 19CR-0009. In the judgment for case No. 19CR-0009, the trial court stated the jury found Lathon guilty of carrying a concealed weapon *and* tampering with evidence, with a firearm specification. The trial court sentenced Lathon to 12 months' imprisonment for tampering with evidence, plus a mandatory one-year term for the firearm specification. In the judgment for case No. 19CR-0008, the trial court stated that the jury found Lathon guilty of carrying a concealed weapon, but not guilty of tampering with evidence.

{¶ 170} Prior to trial, an entry was filed entitled "Ordering of Counts for Trial." In that entry, the case No. 19CR-0008 charges were designated Counts 6 and 7 and the case No. 19CR-0009 charges were designated Counts 8 and 9—the reverse of what the jury was instructed. The state believes the jury somehow knew about this original ordering and the trial court's deviation from it, but the state does not explain how the jury could discover this information. We do not find the state's theory plausible.

{¶ 171} An appellate court presumes the jury followed the trial court's instructions. *Whitaker*, 169 Ohio St.3d 647, 2022-Ohio-2840, at ¶ 161. Here, the trial court instructed the jury that Count 7 was the tampering with evidence charge in case No. 19CR-0009. We thus presume that, by acquitting Lathon on Count 7, the jury found Lathon not guilty of tampering with evidence in case No. 19CR-0009. The trial court, therefore, erred in sentencing Lathon for a charge on which the jury acquitted him. Accordingly, we sustain Lathon's ninth assignment of error.

**J. SEVENTH ASSIGNMENTS OF ERROR – Merger**

{¶ 172} By their seventh assignments of error, Lathon and Gardner argue that their convictions should merge for the purposes of sentencing. We disagree.

{¶ 173} Generally, an appellate court reviews de novo a trial court's determination of whether a defendant's offenses should merge as allied offenses under R.C. 2941.25. *Bailey*, 171 Ohio St.3d 486, 2022-Ohio-4407, at ¶ 6; *State v. Guevara*, 10th Dist. No. 21AP-414, 2023-Ohio-1448, ¶ 19. Although appellate courts apply the law to the facts of individual cases to make a legal determination as to whether R.C. 2941.25 allows multiple convictions, "[t]hat facts are involved in the analysis does not make the issue a question of fact deserving of deference to a trial court." *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 25. However, the failure to raise the merger issue at the time of sentencing forfeits all but plain-error review on appeal. *Bailey* at ¶ 7.

{¶ 174} In this case, Lathon objected on merger grounds at his sentencing, but Gardner did not. We, therefore, review the merger issue as to Lathon under the de novo standard and as to Gardner for plain error.

{¶ 175} R.C. 2941.25 states:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 176} To determine whether two or more offenses are allied offenses of similar import, a court must evaluate three separate factors: the import, the conduct, and the animus. *State v. Taylor-Hollingsworth*, 10th Dist. No. 22AP-527, 2023-Ohio-4435, ¶ 16; *Guevara* at ¶ 22. "If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were

committed with separate animus or motivation." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 25.

{¶ 177} The facts of each case drives the merger analysis. *Taylor-Hollingsworth* at ¶ 18. "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." *Ruff* at ¶ 26. In determining whether multiple offenses merge pursuant to R.C. 2941.25, a court must review the entire record. *Taylor-Hollingsworth* at ¶ 17.

{¶ 178} Both Lathon and Gardner argue that the Scene 75 offenses and the offenses charged in their other cases should merge with the gang participation offense because the Scene 75 offenses and other offenses proved elements of the gang offense.[9] However, "there is now no overarching rule to the effect that where one offense is predicated on the commission of another, with the second essentially being an element of the first, the two must automatically merge at sentencing." *State v. McKnight*, 10th Dist. No. 20AP-595, 2022-Ohio-591, ¶ 33. Instead of focusing on the elements of the offenses at issue, we examine whether the harm resulting from the offenses was separate and identifiable.

{¶ 179} The harm that results from the offense of participating in a criminal gang is harm to the general public. *State v. Smith*, 4th Dist. No. 15CA3686, 2016-Ohio-5062, ¶ 118. Lathon's other offenses—improper handling of a firearm and carrying a concealed weapon—also caused a risk of harm to the general public, but a more specific segment of the general public. By illegally carrying a loaded firearm, Lathon presented a danger to those people within firing range of his weapon.

{¶ 180} Like Lathon's other offenses, Gardner's other offenses reflect a separate and identifiable harm. Gardner attempted to elude the police after an officer tried to pull him over for failure to yield. During the ensuing police chase, Gardner sped through a residential neighborhood with a 25-mile-per-hour speed limit at speeds of 70 to 80 miles per hour. He also disregarded stop signs and drove through a high-traffic intersection without slowing or stopping. After ditching his vehicle and running on foot, Gardner tossed a loaded semi-automatic shotgun in a field. Through his conduct, Gardner caused a risk of

---

[9] For Lathon, the other offenses include: two counts of carrying a concealed weapon (case Nos. 19CR-0008 and 19CR-0009) and one count of improper handling of a firearm (case No. 19CR-3233). For Gardner, the other offenses include failure to comply, improper handling of a firearm, tampering with evidence, and having weapons while under disability (case No. 18CR-6143).

harm to other motorists as well as people within firing range of his weapon. *See State v. Wolfe*, 5th Dist. No. 2021 CA 0009, 2021-Ohio-3223, ¶ 22 (fleeing the police at high speeds, which resulted in a failure to comply charge, "presented a risk of serious physical harm to numerous motorists, to both their person and their property"). Gardner compounded this risk by leaving a loaded firearm where anyone—including children—could find it.

{¶ 181} The Scene 75 offenses—aggravated riot and inducing panic, as well as assault as to Lathon—also present separate and identifiable harm. In committing the Scene 75 offenses, Gardner and Lathon caused alarm to the patrons of Scene 75 and economic harm to Scene 75. The fight at Scene 75 also resulted in physical harm to at least one Scene 75 employee.

{¶ 182} Due to the disparity in the harm resulting from the offenses, the Scene 75 offenses and the other offenses are of a dissimilar import to the offense of participating in a criminal gang. Because the offenses at issue meet the first *Ruff* factor, we do not examine the two remaining *Ruff* factors. *See Taylor-Hollingsworth*, 2023-Ohio-4435, at ¶ 28 (holding that if any of the *Ruff* factors is met, the offenses do not merge). We conclude that the trial court did not err, much less commit plain error, in refusing to merge either the Scene 75 offenses or the other offenses with the offense of participating in a criminal gang.

{¶ 183} In addition to arguing merger, Gardner contends that the trial court erred in ordering him to serve the sentence in the "high-speed chase case," case No. 18CR-6143, consecutive to the sentence in the "gang case," case No. 19CR-6559. Gardner, however, makes no argument to support this contention. An appellant, not the appellate court, must construct the legal arguments in support of his or her assignment of error. *I.T.*, 2024-Ohio-2182, at ¶ 20; *Bell*, 2020-Ohio-1397, at ¶ 7; *Coogan*, 2019-Ohio-3016, at ¶ 14. Without an argument to review, we will not address Gardner's contention.

{¶ 184} In sum, the trial court did not err in refusing to merge Lathon's and Gardner's convictions for the purpose of sentencing. Accordingly, we overrule Lathon's and Gardner's seventh assignments of error.

### IV. CONCLUSION

{¶ 185} For the foregoing reasons, we overrule Lathon's first through eighth assignments of error, and we sustain Lathon's ninth assignment of error. We affirm the judgments in case Nos. 19CR-0008, 19CR-3233, and 19CR-6566. We, however, reverse the

judgment in case No. 19CR-0009, and we remand this matter to the Franklin County Court of Common Pleas so the trial court can resentence Lathon as to Count 1 (carrying a concealed weapon) only.

{¶ 186} We overrule Gardner's first through seventh assignments of error, and we affirm the judgments in case Nos. 18CR-6143 and 19CR-6559.

*Judgments in case Nos. 18CR-6143, 19CR-0008,*
*19CR-3233, 19CR-6559, and 19CR-6566 affirmed;*
*Judgment in case No. 19CR-0009 reversed;*
*cause remanded.*

BOGGS, J., concurs.
EDELSTEIN, J., concurs in part and dissents in part.

EDELSTEIN, J., dissenting in part and concurring in part.

{¶ 187} Because I would find the state's evidence legally insufficient to support Lathon and Gardner's convictions for participating in a criminal gang, I respectfully dissent from the majority's decision affirming those convictions. For the following reasons, I would sustain Lathon and Gardner's first assignments of error.

{¶ 188} Evidence and testimony about the October 19, 2019 incident at Scene 75—including video surveillance footage—clearly established Lathon and Gardner's involvement in the fight. Indeed, neither appellant challenges the propriety of their convictions for aggravated riot, inducing panic, or assault in connection with that incident on appeal.

{¶ 189} But, in addition to these offenses, the state also alleged Lathon and Gardner, along with the seven other men involved in the Scene 75 incident—Calvin Fluellen, Qweontay ("Brent") Smith, Derrick Greathouse, Taeshawn Hardy, Isaiah Webster, Lance Williams, and Daevionte Draper—were active participants in the purportedly criminal gang, Everything King Terk ("EKT"). Although all nine men were indicted together as codefendants, they were not all tried together due to COVID-19 limitations in effect at that time. (*See* Tr. Vol. V at 977.) In any event, there is no question these nine men grew up together in the same neighborhood and associated with each other in the Linden community over the course of many years. (*See, e.g.*, Tr. Vol. VII at 1400-02.)

{¶ 190} Through a single indictment, these nine men were accused of participating in a criminal gang from December 18, 2014 to December 18, 2019, in violation of R.C.

2923.42(A). Under this statutory section, the state is required to prove four elements: (1) the existence of a "criminal gang," as defined in R.C. 2923.41(A); (2) each charged defendant's active participation in the criminal gang; (3) each charged defendant's knowledge that the criminal gang engages in or has engaged in a "[p]attern of criminal gang activity," as defined in R.C. 2923.41(B); and (4) each charged defendant's purposeful promotion, furtherance, assistance of, or commission of or engagement in, any "[c]riminal conduct," as defined in R.C. 2923.41(C).

{¶ 191} On appeal, Lathon and Gardner both contend the evidence was insufficient to support their convictions for participating in a criminal gang. For the following reasons, I agree.

{¶ 192} In January 2014, Calvin Fluellen shot and killed his friend, Terrico "King Terk" Henry (seemingly by accident) and was adjudicated a delinquent minor for the offense of reckless homicide with a firearm specification on July 15, 2014. (*See* Joint Ex. 2 at ¶ 5(b); Tr. Vol. V at 1000-05, 1034-35; Tr. Vol. VI at 1192-93.) Sometime after Fluellen was released from custody in 2015, Officer Kistner recounted seeing the moniker "EKT" used by people in the Linden community, which stood for "Everything King Terk." (Tr. Vol. V at 1002-03. *See also* Tr. Vol. VI at 1176.) Even in Officer Kistner's own estimation, the group bonded and formed under this moniker as "a way to remember the young man." (Tr. Vol. V at 1003.) Fluellen then began pursuing a rap career under the stage name "EKT 40," with Lathon, Gardner, and the other six charged defendants appearing in his music videos. (*See, e.g.*, Tr. Vol. V at 1002-05.) It is the state's contention that EKT is not just a commemorative moniker or hip-hop collective, but also a criminal gang.

{¶ 193} Under R.C. 2923.41(A), a criminal gang is defined as an ongoing organization, association, or group of three or more persons identified by a common name or common identifying signs, symbols, or colors that has as one of its primary activities the commission of one or more of the offenses listed in R.C. 2923.41(B)(1) and in which the associated persons individually or collectively engage in or have engaged in a "[p]attern of criminal gang activity," as defined in R.C. 2923.41(B). A partial list of the offenses in R.C. 2923.41(B)(1) includes, in relevant part, felonies, violent offenses, and improper handling of firearms in a motor vehicle in violation of R.C. 2923.16.

{¶ 194} A pattern of criminal gang activity occurs when "persons in the criminal gang have committed, attempted to commit, conspired to commit, been complicitors in the commission of, or solicited, coerced, or intimidated another to commit, * * * or be in complicity in the commission of two or more" offenses specified in R.C. 2923.41(B)(1). There is a "[p]attern of criminal gang activity" regarding the specified offenses when at least one of the two or more specified offenses is a felony, at least one of the offenses occurred on or after January 1, 1999, the most recent of the offenses occurred within five years of another of the specified offenses, and the specified offenses are committed on separate occasions or by two or more persons. R.C. 2923.41(B)(2).

{¶ 195} Over the objection of the defense, the state presented extensive evidence and testimony about conduct and crimes dating back to 2008 involving members of the Windsor Terrace Posse and/or Banger Squad (aka "Banger Squad Boyz" and "BSB")—both documented criminal gangs associated with the Linden neighborhood. Detective Kirk testified that Windsor Terrace Posse was "the main Crip set within the Winsor Terrace" neighborhood in 2007/2008. (Tr. Vol. VI at 1179-86.) At some unspecified point in time, "a younger age group" from the Linden neighborhood "created Banger Squad" as an affiliate of Windsor Terrace Posse (*See* Tr. Vol. VI at 1179-86.) The state was also permitted to present, over objection by the defense, considerable evidence and testimony about conduct and crimes committed by persons who were described as documented or suspected members of Windsor Terrace Posse and/or Banger Squad—but never shown to be members of EKT. This included evidence and testimony about Angelo Womick, Ricky Walton, Darvon Hickman, Jordan Moore, George Collins, DeAngelo Banks, Lee Martis, Edward Givens, Andre Rogers, Quan Oliver, Marcus Jones, Tyriq Glasgow, Eric Brown, Josh Collins, Vonte Jackson, Jordan Wade, Kaleonte Jones, and Derrick Davis. (*See, e.g.*, Tr. Vol. V at 973-82, 989-91, 999-1001, 1005-14, 1032; Tr. Vol. VI at 1181-1202, 1259-61; Ex. H1.)

{¶ 196} Notwithstanding defense counsel's repeated objections to the relevance of and prejudice associated with evidence and testimony about Windsor Terrace Posse, Banger Squad, and the conduct of their associated members, the trial court determined such evidence was necessary and relevant to proving EKT is a "[c]riminal gang," as defined in R.C. 2923.41(A), and "the underlying gang pattern of criminal activity" by its members,

as defined in R.C. 2923.41(B)(1). (*See, e.g.*, Tr. Vol. V at 970-1000, 1007-09, 1032-33; Tr. Vol. VI at 1179-1202, 1273-74, 1299, 1300; Tr. Vol. VII at 1370-72.) Indeed, it was the state's contention that, at some point, EKT evolved from a commemorative community symbol and music entertainment group into a criminal gang. But, on review of the record, the evidence presented at trial failed to establish when that period began.

{¶ 197} As the majority correctly notes, EKT as a moniker for this group was not established until at least 2015—if not "years" after Henry was shot and killed in 2014. (*See* Majority Decision at ¶ 34, citing Tr. Vol. V at 1002-03. *See also* Tr. Vol. VI at 1176.) It follows, then, that because EKT did not exist until at least 2015 (if not later), evidence and testimony about conduct and crimes that occurred prior to 2015 was not relevant to proving EKT is a criminal gang, as defined in R.C. 2923.41(A), determining EKT's primary activities, proving appellants' active participation in EKT, or showing appellants' knowledge that EKT engages in a pattern of criminal activity. As such, it should have been excluded from trial.

{¶ 198} Thus, the trial court erred in permitting the state to present evidence and testimony that clearly preceded the formation of EKT. For instance, the state was permitted to present testimony about Ricky Walton's possession of a firearm in a vehicle in September 2013—before EKT came into existence—and Lathon's presence in that vehicle. (*See* Tr. Vol. V at 984-86, 1032-33.) But, nothing in the record suggested Walton is a documented or suspected member of EKT or that Lathon was charged in connection with that incident. (*See* Tr. Vol. V at 984; Ex. H1.) Additionally, the state elicited testimony from Detective Kirk about Lathon, Webster, Hardy, and Fluellen, among others, running away from the scene of a fight between Banger Squad and another alleged criminal street gang in Linden, Trevitt and Atcheson, in September 2013. (*See* Tr. Vol. VI at 1189-91.) However, it does not appear from the record that Lathon (or any of the other future alleged members of EKT) were involved in that fight or charged in connection therewith. (*See* Tr. Vol. VI at 1189-91.) Thus, in addition to such evidence being irrelevant to proving the criminal gang participation offense under Evid.R. 402, I would find this evidence, as it relates to Lathon, also should have been excluded from trial under Evid.R. 404(B) and, more broadly for both appellants, under Evid.R. 403(A).

{¶ 199} I agree with the majority's determination that "the state had to rely on offenses other than the Scene 75 offenses to show that Lathon and Gardner had knowledge

of EKT's alleged pattern of criminal gang activity." (Majority Decision at ¶ 55.) But, I would also discount evidence about the November 15, 2019 fight at Wendy's involving Fluellen and other alleged members of EKT.[10] (*See* Tr. Vol. VI at 1252-60, 1277-78; Tr. Vol. VII at 1474-75, 1489-90.) Neither Lathon nor Gardner were alleged to have been involved in this incident. Rather, evidence and testimony about this incident was presented, over the objection of the defense, to "provide background for the gang charge for Count 1," the participation in a criminal gang offense. (Tr. Vol. VI at 1252-56.) But the fight at Wendy's occurred a month ***after*** the October 19, 2019 incident at Scene 75. Similarly, Gardner's November 6, 2019 message to Fluellen via Instagram ("On crip") was sent after the Scene 75 incident. (Ex. M1.)

{¶ 200} As the majority notes, "[f]or the requisite knowledge to arise, the 'pattern of criminal gang activity' must consist of offenses that occurred ***before*** the accused's 'criminal conduct' (activity the 'gang engaged in') or ***concurrently with*** the accused's 'criminal conduct' (activity the 'gang engages in')." (Emphasis added.) (Majority Decision at ¶ 53.) And I believe this is sound rationale. Logically, too, then, a criminal gang must exist before or at the time the criminal conduct that allegedly satisfied the individual conduct element occurred. Thus, evidence and testimony purporting to prove EKT was a criminal gang or determine its primary activities should have been limited to events that occurred on or before October 19, 2019 in this case.

{¶ 201} Most critically, I would find the state failed to present sufficient evidence at trial establishing when EKT evolved from a commemorative group to a "criminal gang," as defined in R.C. 2923.41(A). At trial, the state presented evidence and testimony about rap videos, group photographs, social media activity, tattoos, attire, jewelry, language, nicknames, and other paraphernalia to purportedly establish that EKT was a criminal gang, that Lathon and Gardner were active participants in it, and that they knew the criminal gang engages in or has engaged in a pattern of criminal gang activity. (*See, e.g.*, Tr. Vol. V at 968-70, 992-1000, 1023-32; Tr. Vol. VI at 1141-72, 1215-25, 1233-34, 1261-1300; Tr. Vol. VII at 1355-64; Ex. I Series (tattoos).) But, that a group of young men who grew up together in a difficult neighborhood and attended the same schools have developed a sense of

---

[10] Although the trial prosecutor told the judge that the Wendy's incident "is the robbery," the evidence presented to the jury only indicated that Fluellen and others were involved in a fight. (*Compare* Tr. Vol. VI at 1253-54, *with* Tr. Vol. VI at 1258-60, 1277-78.)

community amongst themselves, share interests, and feel loyalty to each other is not surprising or criminal.  And, while imprudent, the notion that loyalty to another can compel someone to join them in a fight is not unique to criminal gangs.[11]

{¶ 202} As the majority notes, the state did not provide expert testimony identifying any criminal activity listed in R.C. 2923.41(B) as one of EKT's primary activities.  (Majority Decision at ¶ 33.)  However, in closing, the trial prosecutor posited to the jury that one of EKT's primary activities was "assault."  (Tr. Vol. VIII at 1573-74.)  It is true, as the majority observes, the state produced evidence that four EKT members—including one wearing an EKT shirt—assaulted a member of Easthaven at the Ohio State Fair on July 29, 2019.  (Majority Decision at ¶ 6, 37, 46.  *See* Tr. Vol. VI at 1222-26; Ex. N-16; N-18; N-19.)  The state also produced evidence that Lathon was an active participant in the fight.  (*See* Tr. Vol. VI at 1223-25.)  But, beyond that incident, I do not believe, for the reasons explained below, the state's  evidence was adequate to establish one of EKT's primary activities was the commission of offenses listed in R.C. 2923.41(B) (a necessary component to proving EKT was a criminal gang under R.C. 2923.41(A) or appellants' knowledge of EKT's pattern of criminal gang activity (a necessary element of the participating in a criminal gang offense under R.C. 2923.42(A)) prior to October 19, 2019.

{¶ 203} The majority concludes the state's evidence failed to establish EKT is a successor to the Windsor Terrace Posse or the Banger Squad.  (*See* Majority Decision at ¶ 35-36.)  I agree.  And, significantly, neither Lathon nor Gardner were alleged to have been members of these "affiliated-but-separate" entities.  (*See* Majority Decision at ¶ 35.)  Thus, evidence about Windsor Terrace Posse, Banger Squad, and persons who were not

---

[11] *See, e.g.*, Homero De la Fuente, *Big Ten Fines Michigan, Ohio State $100k Each for Postgame Brawl*, CNN (Dec. 2, 2024), https://www.cnn.com/2024/12/01/us/michigan-ohio-state-football-fight-intl/index.html (accessed Dec. 9, 2024) [https://perma.cc/N4WJ-Y3LQ]; David K. Li, *Giant Brawl Breaks Out During Handshakes After College Basketball in San Antonio*, NBC NEWS (Feb. 20, 2024), https://www.nbcnews.com/news/us-news/giant-brawl-breaks-handshakes-college-basketball-game-san-antonio-rcna139558 (accessed Dec. 9, 2024) [https://perma.cc/7MSC-XS95]; Hal Fox, *Fraternity Fight Amasses Millions of Views Online as Brawl Breaks Out in Stands*, THE DAILY MISSISSIPPIAN (Oct. 5, 2022), https://thedmonline.com/fraternity-fight-amasses-millions-of-views-online-as-brawl-breaks-out-in-stands (accessed Dec. 9, 2024) [https://perma.cc/QDZ9-74A7]; Michael Chavez, *Seven Jackson State Football Players Suspended After Alabama State Postgame Fight*, CLARION LEDGER (Nov. 18, 2024), https://www.clarionledger.com/story/sports/college/jackson-state/2024/11/18/jackson-state-football-fight -punishment-suspension/76138062007/ (accessed Dec. 9, 2024) [https://perma.cc/SK5U-BFPT]; Kayla Kamil, *Three Miami Football Players Charged in Fraternity Brawl*, OXFORD OBSERVER (Oct. 30, 2020), https://oxfordobserver.org/3168/miami/three-miami-football-players-charged-in-fraternity-brawl (accessed Dec. 9, 2024) [https://perma.cc/4X7D-E4WV];

documented or suspected members of EKT was not relevant to proving *EKT* was a criminal gang or establishing appellants' knowledge of *EKT's* pattern of criminal activity.

{¶ 204} The problem with the state's evidence, then, lies in oversaturation. Indeed, because the state was permitted to present a significant amount of evidence and testimony about conduct and incidents involving members of the Windsor Terrace Posse and Banger Squad that occurred before and overlapped with EKT's alleged metamorphosis from a commemorative group of neighborhood friends to an allegedly criminal gang, it is difficult to ascertain, in terms of a precise date, when EKT as a "criminal gang" truly began and who was (and was not) a member of it at that time.

{¶ 205} Officer Kistner and Detective Kirk both testified extensively about field interview notes documenting criminal activity, suspicious events, and group associations in the Linden neighborhood over many years, which were not just confined to incidents involving alleged members of EKT. (*See, e.g.*, Tr. Vol. V at 952-70, 1016-40; Tr. Vol. VI at 1128-1211.) It is clear that some purported members of EKT were also involved in the "affiliated-but-separate" groups (Windsor Terrace Posse and/or Banger Squad). At the same time, the state's evidence did not establish (or even allege) that other purported members of EKT—including Lathon and Gardner—were members of these other entities. Again, there is no dispute that all of the people discussed at trial knew, grew up with, and hung around each by virtue of the fact that they lived in the same neighborhood. (*See, e.g.*, Tr. Vol. V at 1026-28.) Indeed, Officer Kistner and Detective Kirk discussed field reports documenting the presence of Lathon, Gardner, Fluellen, Draper, Webster, and Hardy in the Linden neighborhood and their associations with (or proximity to) documented or suspected members of Windsor Terrace Posse and/or Banger Squad long before EKT's formation. (*See, e.g.*, Tr. Vol. V at 952-70, 1016-40; Tr. Vol. VI at 1128-33; Tr. Vol. VII at 1388-1446.) Notably, too, Officer Kistner and Detective Kirk both acknowledged the moniker "EKT" began as a way for men and women of all ages in the Linden community to memorialize Henry following his death. (*See, e.g.*, Tr. Vol. V at 1026-32.)

{¶ 206} Given the overbreadth and scope of the state's historical evidence about groups and people living in the Linden community, it is difficult to ascertain when EKT formed as a group, when it allegedly evolved into a criminal gang, and when Lathon, Gardner, and other alleged participants' membership in EKT began. The issue is trying to

sift through the mountain of evidence and testimony about suspicious activity and bad acts of a large group of people to determine what is relevant to proving the criminal gang offense charged in this case. Other than the July 2019 incident at the Ohio State Fair involving Lathon and three other alleged members of EKT, I do not believe we can. As a result, I do not think it is possible—even assuming EKT is a criminal gang—to ascertain whether Lathon or Gardner had knowledge of EKT's pattern of criminal activity. The state's evidence regarding Derrick Greathouse is the best example of my concern. At trial, Greathouse was identified as a member of the Windsor Terrace Posse. (Tr. Vol. V at 994.) He also participated in a rap video shoot with members of the Banger Squad in May 2017 that resulted in the recovery of drugs and other contraband (Tr. Vol. V at 996-1000) and was also identified as a documented member of EKT in connection with the October 2019 incident at Scene 75 (Tr. Vol. VI at 1235-36). Based on the record, it is difficult to ascertain when his—and everyone else's—alleged criminal conduct relevant to their membership in EKT even began.

{¶ 207} For instance, Officer Kistner testified about associates of the Banger Squad being investigated for food stamp fraud and drug sales in May 2017, which resulted in the subsequent seizure of a large amount of cocaine, a 50-round drum magazine, ammunition, and spent shell casings being recovered from a vehicle associated with the group while 13 "documented or suspected" members of Banger Squad were filming a rap video. (*See* Tr. Vol. V at 995-1000.) True, Officer Kistner indicated Greathouse was present in his capacity as a documented or suspected member of Banger Squad. (*See* Tr. Vol. V at 998-1000.) But nothing in the record established Greathouse, himself, engaged in food stamp fraud, drug offenses, firearm offenses, or otherwise in May 2017. (*Compare* Tr. Vol. V at 995-1000, *with* Joint Ex. 2 at ¶ 5.) And, most significantly, nothing in the record before the court indicates that EKT began functioning as a criminal gang in May 2017 or that Greathouse was a member at that time.

{¶ 208} The state also presented evidence suggesting Fluellen was shot by his cousin, Eric Smith Ross (allegedly a member of Easthaven), possibly—although not clearly established by the evidence presented at trial—at the Red Club in January 2018. (*See* Tr. Vol. VI at 1226-30, 1279-80.) In any event, evidence that Fluellen was shot by his cousin at a club and subsequently posted on social media (*see* Tr. Vol. VI at 1226-30; Ex. N20; Ex.

N21; Ex. N22) and rapped about being upset over it (*see* Tr. Vol. VI at 1279; Ex. R1) does not establish a pattern of criminal activity by members of EKT.

{¶ 209} On review of the record, I can only say it is clear that EKT's members began engaging in criminal conduct in July 2019 when four of its members (including Lathon) assaulted an alleged member of Easthaven at the Ohio State Fair. (*See* Tr. Vol. VI at 1222-25; Ex. N16.) But, before that, it is difficult to delineate between the criminal conduct of individuals before they became involved in EKT and criminal conduct that a jury could reasonably find to be part of EKT's "pattern of criminal gang activity." Evidence at trial showed Lathon and Gardner both improperly handled a firearm in a vehicle, in violation of R.C. 2923.16, sometime prior to July 2019. And, I recognize that a violation of R.C. 2923.16 is among the type of offenses that can be considered in determining whether a pattern of criminal gang activity exists. *See* R.C. 2923.41(B)(1)(c). But, because I do not think it is possible to ascertain when, prior to July 29, 2019, EKT's pattern of criminal gang activity began, given the state's presentation of inextricably intertwined evidence about members of and conduct related to other gangs, I cannot say the state's evidence was sufficient to prove Lathon or Gardner's knowledge of EKT's pattern of criminal activity. Indeed, all of the weapon offenses for which Lathon and Gardner were charged occurred prior to July 29, 2019.

{¶ 210} The state also presented photographs and social media posts from Lathon and Gardner purporting to show their affiliation with EKT and alleged knowledge about criminal gang activity in which its members allegedly were engaged. (*See* Ex. L Series.) But, the record does not clearly establish when these posts were made, much less prove when any of the photographs were taken. (*See* Tr. Vol. VI at 1285-90; Ex. L Series.) True, a number of the photographs taken from appellants' social media pages show various persons posing with guns. But, these images do not demonstrate a "pattern of criminal gang activity." As statutorily defined, a "pattern of criminal gang activity" occurs when "persons in the criminal gang have committed, attempted to commit, conspired to commit, been complicitors in the commission of, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of two or more" offenses specified in R.C. 2923.41(B)(1). This includes, but is not limited to,

a felony offense, an offense of violence, improperly handling firearms in a motor vehicle, and drug trafficking. *See* R.C. 2923.41(B).

{¶ 211} Most notably, the state did not prove any of the firearms visible in the photographs posted to social media were operable or could readily be rendered operable (*see, e.g.*, Ex. L Series), as required to prove any offense involving the unlawful possession of a firearm. *See* R.C. 2923.11(B)(1) (defining "[f]irearm" as "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant," including an "unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable"). Moreover, the weapon under disability statute, R.C. 2923.13, is not included in R.C. 2923.41(B)(1)(c)'s enumerated offenses for showing a "pattern of criminal gang activity." Only one of the social media photographs depicted an alleged member of EKT, Brent Smith, holding a firearm in a vehicle. (Ex. K4.) But, again, neither the date of this photograph nor the operability of the firearm is established by the record below.

{¶ 212} The state presented, over the objection of the defense, messages recovered from Fluellen's Instagram account as evidence relevant to proving EKT was a criminal gang. (*See* Tr. Vol. VI at 1115-24, 1290-95; Ex. M Series.) But all of these messages were sent after the July 29, 2019 incident at the Ohio State Fair. (*See* Ex. M Series.) None of the messages recovered from Fluellen's Instagram were communications with Lathon. While one of these messages was from Gardner to Fluellen ("On crip"), it was sent on November 6, 2019—*after* the Scene 75 incident. (*See* Ex. M1). Detective Kirk opined this message indicated Gardner was telling Fluellen he "swears to something on CRIP." (Ex. M1; Tr. Vol. VI at 1290-91.) But, as explained above, evidence relevant to proving the criminal gang offense needed to predate the Scene 75 incident. Ultimately, then, Fluellen's Instagram messages did nothing to establish Lathon or Gardner's knowledge that EKT engaged in a pattern of criminal gang activity *before* they actively participated in the Scene 75 incident in October 2019. Thus, I believe it should have been excluded from trial under Evid.R. 402 and/or 403(A).

{¶ 213} Although the state did not claim either appellant in this case was a narcotics dealer and did not present evidence suggesting that narcotics trafficking was among one of EKT's primary activities, the state was nonetheless permitted to present, over the objection

of the defense, evidence that some EKT members may have sold or been suspected of selling drugs at some point in their lives.  (*See* Tr. Vol. VII at 1351-55, 1438; Ex. H4.)  Detective Kirk specifically testified that Greathouse had a "prior drug conviction," but nothing in the record before us established when that conviction was entered or, for that matter, that he was convicted of drug ***trafficking*** as opposed to drug ***possession***.  (*See* Tr. Vol. VI at 1297.  *See also* Ex. H4.)  Detective Kirk also testified, over the objection of the defense, about Brent Smith's post to Facebook ("They #Told Me #Heroine #Kills I Told Em #Heroin Pay The #Bills," followed by a sequence of emojis) from March 28, 2017.  (Tr. Vol. VII at 1351-52; Ex. K1.)  But nothing in the record established that Smith actually sold drugs or when any alleged or suspected member of EKT purportedly sold drugs.  Given the state's presentation of evidence relevant to the pattern of criminal gang activity committed by ***other*** criminal gangs, I do not believe any evidence of drug activity presented in this case could be attributed to a pattern of criminal gang activity committed by members of EKT.  As such, I believe this evidence should have been excluded as irrelevant or unduly prejudicial under Evid.R. 402 and 403(A).

{¶ 214} Unlike the majority decision, I would not consider hyperbolic rap lyrics or social media posts made by persons other than Lathon and Gardner as proof of actual crimes being committed by alleged members of EKT or appellants' knowledge that EKT engages in or engaged in a pattern of criminal activity, as defined in R.C. 2923.41(B)(1), when those statements lacked corroboration by direct evidence.  It goes without saying that young people are not always truthful when they post on social media and often present a false or distorted version of reality.  Indeed, this concept rings particularly true for youth who grow up in neighborhoods that are dominated by gang influence.  Coined as "cyber banging" and "internet banging," these terms refer to gang-associated youth who utilize social media and the internet to "broadcast their gang affiliation, brag about a recent fight or murder and communicate threats."[12]  But, these posts can come from "a desire for

---

[12] Desmond Upton Patton, Robert D. Eschmann & Dirk A. Butler, *Internet Banging: New Trends in Social Media, Gang Violence, Masculinity and Hip Hop*, 29 COMPUTS.HUM.BEHAV. A54, A58 (2013).

recognition and dignity in a world where young men from the inner city are otherwise left without" and do not necessarily mirror reality.[13]

{¶ 215} Much like "nineteenth-century novelists from lower-class backgrounds who, in order to compete with their upper-class counterparts, 'peddled exaggerated stereotypes and parodies that aroused the voyeuristic desires of consumers' and 'effectively commodified their stigma, converting negative stereotypes [* * *] into a new form of capital that they exchanged for financial success,' " rappers use their music for self-promotion to gain financial opportunities that would otherwise be unachievable.[14]  Hyperbole—if not complete fabrication—may be necessary to successfully commodify "portrayals of violence, gangs, and 'the hood' " in rap music and online social media presence.[15]

{¶ 216} To be sure, almost too expectantly cliché, much of the state's evidence in this case smacked of the "hip-hop police" that began patrolling the airwaves in the 1990s.[16]  To prove that Lathon and Gardner participated in a criminal gang, in violation of R.C. 2923.42, the state relied on evidence that implicated racial stereotypes.  The state presented evidence and testimony about rap videos, group photographs, social media activity, tattoos, attire, jewelry, language, nicknames, and other paraphernalia to show EKT was a criminal gang, that Lathon and Gardner were active participants in it, and that they knew the criminal gang engages in or has engaged in a pattern of criminal gang activity.  (*See, e.g.*, Tr. Vol. V at 968-70, 992-1000, 1023-32; Tr. Vol. VI at 1141-72, 1215-25, 1233-34, 1261-1300; Tr. Vol. VII at 1355-64; Ex. I Series (tattoos).)

---

[13] *See* Charis E. Kubrin, Kyle Winnen, and Rebecca Rogers, *Rap Rhyme, Prison Time: How Prosecutors Use Rap Evidence in Gang Cases*, 27 CHAP.L.REV. 369, 391-403 (2024).

[14] Charis E. Kubrin, Kyle Winnen, and Rebecca Rogers, *Rap Rhyme, Prison Time: How Prosecutors Use Rap Evidence in Gang Cases*, 27 CHAP.L.REV. 369, 392-93 (2024), quoting Forrest Stuart, *Ballad of the Bullet: Gangs, Drill Music, and the Power of Online Infamy* 3 (2020), discussing Pierre Bourdieu, *The Rules of Art: Genesis and Structure of the Literary Field* (1996).

[15] Charis E. Kubrin, Kyle Winnen, and Rebecca Rogers, *Rap Rhyme, Prison Time: How Prosecutors Use Rap Evidence in Gang Cases*, 27 CHAP.L.REV. 369, 392-93 (2024), citing Forrest Stuart, *Ballad of the Bullet: Gangs, Drill Music, and the Power of Online Infamy* 76 (2020).

[16] *See, e.g.*, Shawn Setaro, *Why Are the NYPD "Hip-Hop Police" Spying on Rappers*, COMPLEX (June 11, 2020), https://www.complex.com/music/a/shawn-setaro/nypd-hip-hop-police (accessed Dec. 9, 2024) [https://perma.cc/P29E-8ZC4]; Dasun Allah, *NYPD Admits To Rap Intelligence Unit*, THE VILLAGE VOICE (Mar. 16, 2004), https://www.villagevoice.com/nypd-admits-to-rap-intelligence-unit/ (accessed Dec. 9, 2024) [https://perma.cc/KN64-SE8Y].

{¶ 217} Notwithstanding First Amendment concerns, courts routinely admit rap music lyrics written and performed by a defendant as evidence at that defendant's trial.[17] But this case is particularly unique because nothing in the record suggests Lathon or Gardner wrote or rapped the lyrics of songs presented by the state as evidence in their trial. (*See, e.g.*, Tr. Vol. VI at 1266-82; Ex. K series (content from Brent Smith's social media accounts); Ex. L Series (photographs from Lathon and Gardner's social media accounts); Ex. M Series (messages extracted from Fluellen's social media account); Ex. N series (content from other alleged EKT members' social media accounts); Ex. O1 (summarizing "Bleed About" lyrics rapped by Fluellen and Detective Kirk's observations of participants' conduct in a music video posted on February 17, 2019 in which neither appellant appears); Ex. P Series (summarizing "Famous" lyrics rapped by Fluellen and Detective Kirk's observations of participants' conduct in a music video posted on January 17, 2020—***after*** the Scene 75 incident—in which neither appellant appears); Ex. Q Series (summarizing "Sad to Say" lyrics rapped by Fluellen and Detective Kirk's observations of participants' conduct in a music video posted on September 28, 2019 in which only Lathon appears); Ex. R Series (summarizing "Snake" lyrics rapped by Fluellen and Detective Kirk's observations of participants' conduct in a music video posted on June 10, 2019 in which Lathon and Gardner both appear); Ex. S Series (summarizing "Stop Playin" lyrics rapped by Fluellen in a music video posted on August 30, 2019 in which neither appellant appears); Ex. T Series (summarizing "Straight Cap" lyrics rapped by Fluellen and Detective Kirk's observations of participants' conduct in a music video posted on June 24, 2019 in which Lathon and Gardner both appear); and Ex. U Series (summarizing "Yeah" lyrics rapped by Fluellen and Detective Kirk's observations of participants' conduct in a music video posted on March 25, 2019 in which only Lathon appears).

{¶ 218} All of the lyrics in those videos were rapped by and attributed to Fluellen (*see* Tr. Vol. VII at 1419-27)—who, ironically, was found not guilty of participating in a criminal gang at his separate trial. (*See* Lathon Reply Brief at 4.) Of the seven videos discussed at trial, Lathon appeared in four and Gardner in just two. They do not rap in any of these

---

[17] *See, e.g.*, Elliott C. McLaughlin, *Hip-Hop Wants Supreme Court to Rule, Again, On When Threatening to Kill Constitutes Art*, CNN (Mar. 19, 2019), https://www.cnn.com/2019/03/14/us/first-amendment-rappers-supreme-court-elonis/index.html (accessed Dec. 9, 2024) [https://perma.cc/3F2U-E7QJ]; Charis E. Kubrin, Kyle Winnen, and Rebecca Rogers, *Rap Rhyme, Prison Time: How Prosecutors Use Rap Evidence in Gang Cases*, 27 CHAP.L.REV. 369 (2024).

videos. Nonetheless, the state was permitted to offer these rap videos as substantive evidence of the criminal gang offense, including Fluellen's rap lyrics, as purportedly autobiographical depictions of actual events and appellants' alleged knowledge of crimes committed. (*See* Majority Decision at ¶ 6-8.) Because Fluellen was not called as a witness, Lathon and Gardner had no opportunity to question him about the veracity of the events depicted in his song lyrics. But, that is not all. Through the testimony of Detective Kirk, the state was permitted to construct a narrative framework using Fluellen's song lyrics that was consistent with the prosecution's evidence of other crimes Fluellen allegedly committed. (*See* Majority Decision at ¶ 8.)

{¶ 219} In my view, it is problematic for courts to treat rap music lyrics as ordinary speech subject to a literal interpretation rather than an art form. One concerning pattern in gang cases is the use of a purported gang expert—typically someone in law enforcement—to testify on the meaning and significance of rap lyrics and videos, despite having no "educat[ion] on the genre's complex history, conventions, and practices, especially as they relate to the rap-gang intersection."[18] Almost uniformly, the state's law enforcement "gang experts" claim that rap lyrics and videos are literal statements that indicate participation in, or association with, gangs and the criminal life, and "treat rap lyrics as literal accounts of a defendant's associations, feelings, intentions, or actions."[19]

{¶ 220} More concerningly, here, rap lyrics attributed to ***someone else*** (Fluellen) entirely were presumed to depict real events and presented, over the objection of the defense, as substantive evidence against Lathon and Gardner without regard to the questionable evidentiary value of those lyrics. (*See* Tr. Vol. VI at 1165-72, 1211-21, 1267-82, 1296-1300; Tr. Vol. VII at 1407, 1426, 1461-62, 1472-79.)

{¶ 221} Most notably, in "Sad to Say" (posted September 28, 2019, Lathon participating), Detective Kirk opined that Fluellen's lyric "The n****s be lyin out here and be fakin, that's the reason we be robbin and takin" referred to "some members"—none of

---

[18] Charis E. Kubrin, Kyle Winnen, and Rebecca Rogers, *Rap Rhyme, Prison Time: How Prosecutors Use Rap Evidence in Gang Cases*, 27 CHAP. L. REV. 369, 381 (2024). *See also* Andrew Jensen Kerr, *When to Admit Art as Evidence*, 101 WASH. UNIV. L. REV. ONLINE 29 (2023), https://wustllawreview.org/wp-content/uploads/2023/11/Kerr-When-to-Admit-Art-as-Evidence.pdf (accessed Dec. 9, 2024) [https://perma.cc/7YQU-BXUZ].

[19] Charis E. Kubrin, Kyle Winnen, and Rebecca Rogers, *Rap Rhyme, Prison Time: How Prosecutors Use Rap Evidence in Gang Cases*, 27 CHAP. L. REV. 369, 381, 398 (2024).

whom were identified—having been charged and convicted of robbery. (Tr. Vol. VI at 1267-68; Ex. Q1.) He further opined that this lyric was consistent with Fluellen's social media postings from an unspecified date indicating Fluellen, along with other unidentified people, robbed a trap house (a location known to prepare, store, and sell drugs). (*See* Tr. Vol. VI at 1212-15; Ex. N15.) The majority cites this testimony and evidence as "circumstantial evidence" of appellants' knowledge of other crimes committed by EKT. (Majority Decision at ¶ 59-60.) Nothing in the record suggests, however, Fluellen (or anyone else) was charged in connection with this incident or that it was reported to police. Even assuming this alleged robbery happened—and I do not believe the record before us clearly establishes that it did— there is no indication as to when it occurred, which is necessary to assessing whether "[t]he last of [the] two or more offenses [specified in R.C. 2943.41(B)(1)] occur[ed] within five years after at least one of those offenses," as required by R.C. 2923.41(B)(2)(c). (Majority Decision at ¶ 50.) And, contrary to the majority's conclusion otherwise, I do not believe it is reasonable to infer that Lathon or Gardner knew about events in music videos in which they did not appear. (*See* Majority Decision at ¶ 59-60.)

{¶ 222} Other lyrics cited by Detective Kirk in the music videos where Lathon and Gardner appear are ubiquitous to the form of art. In "Sad to Say," Fluellen references a need to ride around with an assault rifle because "these n****s hatin on me." (Ex. Q1.) This concept is neither novel to rap music nor sufficient to prove actual criminal conduct. In "Snake" (posted June 10, 2019, Lathon and Gardner participating), Fluellen allegedly references his cousin's (Eric Smith Ross) prior attempt to harm him ("[h]ow you my blood, tryna be part of my murda"), indicates he would "[r]ather go to jail before a n**** kill" him, and further states "I'll kill any man that's no civilian." (Ex. R1. *See also* Tr. Vol. VI at 1279-82.) Notably, nothing in the record suggests Fluellen (or anyone else affiliated with EKT) has ever harmed or attempted to harm Smith Ross or a police officer. In "Yeah" (posted March 25, 2019, Lathon participating), Fluellen raps about having diamonds and guns. (Ex. U1; *See also* Tr. Vol. VI at 1270-73.) In "Straight Cap" (posted June 24, 2019, Lathon and Gardner participating), Fluellen raps about robbing "him for his Cuban"—which Detective Kirk opined was a reference to a "Cuban chain"—but nothing in the record suggested this represented a factual event. (*See* Ex. T1; Tr. Vol. VI at 1218-21.) He also generally raps about guns and, according to Detective Kirk, specifically references Gordon

("My n****s ain't talkin, don't make me call on Marcus * * *, bitch you better be cautious"), Maurice Cannon ("Trigga Tre * * * up in that slamma * * *, fuck the opps[,] * * * no he can't stand[]'em"), and Draper ("Don't make me call that D Wade * * *, just do what he say, hit that boy from both ways"). (*See id.*) Again, this concept of carrying firearms is not unique to the genre or, more precisely, evidence of or admissions to actual crimes committed.

{¶ 223} It is important to note the jury was not provided full lyrics to any of Fluellen's songs. Rather, they were given what Detective Kirk believed were the relevant and incriminating excerpts of Fluellen's songs. This is significant because the jury did not have the ability to view the lyrics in context to fully appreciate how often Fluellen rapped about things that were not true. As evidenced even from the lyrics excerpted by Detective Kirk, Fluellen is prone to hyperbole and hypotheticals, and many verses are written with a rhyme scheme or alliterative concept in mind. (*See* Ex. T1.) Thus, because of the nature of the art form, it is difficult to delineate between statements based in fact and those statements made merely in furtherance of the verse as creative expression.

{¶ 224} Indeed, it is well-recognized that, as an art form, "[r]ap music lyrics are neither inherently truthful, accurate, self-referential depictions of events, nor necessarily representative of an individual's mindset."[20] Thus, they require "awareness and understanding of the complexities of the art form, particularly the existing social constraints and artistic norms governing the composition of rap music lyrics," which "include a highly commercialized rap music industry and a tenet of authenticity alongside traditional artistic conventions such as boasting, metaphor, collective knowledge, narrative and role play."[21] A lack of understanding of rap's complex conventions, coupled with negative stereotypes about the genre, lead to incorrect assumptions and false claims about

---

[20] Andrea L. Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*, 31 COLUM. J.L. & ARTS 1, 4 (2007), available at https://digitalcommons.law.uga.edu/fac_artchop/962 (accessed Dec. 9, 2024) [https://perma.cc/T225-AJAQ]. *See also* Charis E. Kubrin, Kyle Winnen, and Rebecca Rogers, *Rap Rhyme, Prison Time: How Prosecutors Use Rap Evidence in Gang Cases*, 27 CHAP.L.REV. 369 (2024).

[21] Andrea L. Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*, 31 COLUM. J.L. & ARTS 1, 4 (2007), available at https://digitalcommons.law.uga.edu/fac_artchop/962 (accessed Dec. 9, 2024) [https://perma.cc/T225-AJAQ]. *See also* Charis E. Kubrin, Kyle Winnen, and Rebecca Rogers, *Rap Rhyme, Prison Time: How Prosecutors Use Rap Evidence in Gang Cases*, 27 CHAP.L.REV. 369, 396-403 (2024); Andrew Jensen Kerr, *When to Admit Art as Evidence*, 101 WASH. UNIV. L. REV. ONLINE 29 (2023), https://wustllawreview.org/wp-content/uploads/2023/11/Kerr-When-to-Admit-Art-as-Evidence.pdf (accessed Dec. 9, 2024) [https://perma.cc/7YQU-BXUZ].

rap music and rappers, making it difficult for defendants like Lathon and Gardner to receive a fair trial. Given this context, rap lyrics and cyber banging evidence offers low probative value yet is likely to have a high prejudicial impact in gang cases.[22] For these reasons, I disagree with the majority's reliance on uncorroborated rap lyrics and social media posts as evidence supporting the criminal gang participation offense.

{¶ 225} In my opinion, the state's downfall was the lack of discernment in the evidence offered to prove Lathon and Gardner unlawfully participated in a criminal gang. In essence, the state presented evidence and testimony about the conduct of a multigenerational group of black men living in the same neighborhood over the span of many years without any regard to whether that evidence was relevant to showing EKT was a criminal gang or appellants' knowledge that EKT engages in or engaged in a pattern of criminal activity prior to their involvement in the Scene 75 incident. As a result, the only clear evidence of criminal gang activity is the July 2019 assault incident at the Ohio State Fair involving Lathon, Fluellen, Draper, Hardy, and Webster. (*See* Tr. Vol. VI at 1222-26; Ex. N16.) However, this incident, alone, does not satisfy the statutory definition for a "[p]attern of criminal gang activity" in R.C. 2923.41(B).

{¶ 226} Based on the foregoing, I would conclude the state presented insufficient evidence to convict Lathon and Gardner of participating in a criminal gang, in violation of R.C. 2923.42, sustain each of appellants' first assignments of error, vacate each of their convictions for this offense (numbered as Count 1 for purposes of trial), and remand this matter to the trial court for resentencing. I otherwise concur in the majority's analysis of the remaining assignments of error not impacted by the above.

--------

[22] *See* Charis E. Kubrin, Kyle Winnen, and Rebecca Rogers, *Rap Rhyme, Prison Time: How Prosecutors Use Rap Evidence in Gang Cases*, 27 CHAP.L.REV. 369 (2024).